**AMERICAN TRUCKING ASSOCIATION, INC., et al., Petitioners,**

v.

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

No. 80–7674.

United States Court of Appeals, Eleventh Circuit.

Oct. 12, 1982.

Rehearing and Rehearing En Banc Denied Jan. 7, 1983.

Rea, Cross & Auchincloss, David H. Co-burn, Bryce Rea, Jr., Washington, D.C., for American Trucking Ass'n et al.

Lawrence H. Richmond, Gen. Counsel, ICC, Washington, D.C., for ICC.

Barry Grossman, Kenneth P. Kolson, U.S. Dept. of Justice, Washington, D.C., for the U.S.

Thomas M. Auchincloss, Jr., Washington, D.C., for intervenors Ohio Motor Freight

Tariff Committee, Inc., Household Goods Carriers' Bureau, Inc., Steel Carriers' Tariff Ass'n, Inc., Heavy & Specialized Carriers Tariff Bureau, Alaska Carriers Ass'n, Inc.

Belnap, McCarthy, Spencer, Sweeney & Harkaway, Daniel J. Sweeney, Steven J. Kalish, Washington, D.C., for intervenors Nat. Small Shipments Traffic Conference, Inc. and Drug and Toilet Preparation Traffic Conference, Inc.

Leonard A. Jaskiewicz, Edward J. Kiley, Washington, D.C., for intervenors Bulk Carriers Conference, Inc.

Born, Kohlman & Duvall, P.C., Robert E. Born, Atlanta, Ga., for intervenor Nat. Ass'n of Sp. Carriers, Inc.

J. Raymond Clark, Washington, D.C., for intervenor Motor Carriers Traffic Ass'n, Inc.

Before GODBOLD, Chief Judge, ANDERSON, Circuit Judge, and HOFFMAN *, District Judge.

GODBOLD, Chief Judge:

Petitioners [1] brought this action to challenge the validity of rules promulgated by the Interstate Commerce Commission implementing and interpreting recent statutory amendments to the provisions of the Interstate Commerce Act governing the antitrust exemption of motor carrier rate bureaus. We uphold the rules in large part but find one portion of the rules invalid for failure to comply with notice and comment procedures and another portion invalid as being in conflict with the statute.

* Honorable Walter E. Hoffman, U.S. District Judge for the Eastern District of Virginia, sitting by designation.

1. Petitioners include all of the major motor carrier rate bureaus as well as three intervening petitioners representing shippers. We will not distinguish in text between petitioners and intervening petitioners.

## I. Introduction

Since 1948 members of motor carrier rate bureaus have enjoyed antitrust immunity for their activities of collectively submitting motor carrier rates [2] to the Interstate Commerce Commission. *See* Reed-Bulwinkle Act, 62 Stat. 472, codified at 49 U.S.C. § 10706. Rate bureaus traditionally perform two general functions: docketing and collective ratemaking. Broadly speaking, the docketing function involves informing bureau members and the subscribing public of proposed rates prior to submitting rates to the ICC. This provides other carrier bureau members an opportunity to engage in parallel behavior by joining in proposed rates if they wish. Also it provides advance notice to the shipping public enabling them to better object to the Commission if they find fault in a proposed rate. Collective ratemaking involves carrier members of the bureau meeting and conferring on what rates should be submitted to the ICC, creating essentially a forum for cartelization. Both activities are immunized from antitrust scrutiny by the rate bureau provisions of the Interstate Commerce Act, 49 U.S.C. § 10706(b).

Antitrust immunity is obtained by submitting a "rate bureau agreement" with the ICC for its approval, detailing the procedures of a bureau's operations and the rights of its members. Under the old provisions of the Act the ICC exercised sole discretion over the approval of rate bureau agreements. In § 14 of the Motor Carrier Act of 1980, however, Congress enacted a detailed set of statutory restrictions with which motor carrier rate bureaus must comply in order to obtain approval of their agreements from the ICC. 94 Stat. 793, 803, codified at 49 U.S.C. § 10706(b).

2. The same antitrust exemption is available to rail carrier rate bureaus as well, *see* 49 U.S.C. § 10706(a), but the rules challenged here deal only with motor carrier rate bureaus. Therefore, reference to "rate bureaus" throughout refers to only motor carrier rate bureaus, and "carriers" to only motor carriers.

■ In August 1980 the Commission announced without prior notice an interim decision implementing and interpreting these new statutory provisions and inviting comments on the proposed rules. Motor Carrier Rate Bureaus—Implementation of P.L. 96–296, 45 Fed. Reg. 55734 (August 21, 1980). On December 30, 1980, the Commission announced its final decision, 46 Fed. Reg. 30092 (June 5, 1981). This proceeding is a petition to review the final decision.[3] The rules announced in the final decision have not been codified in the Code of Federal Regulations but instead are in the form of a narrative description of the conditions and restrictions that must be contained in rate bureau agreements in order to obtain ICC approval. All rate bureaus are required to resubmit their agreements, modified to conform with the statutory provisions as interpreted in this decision.

## II. Standard of Review

■ In order to establish the proper standard of review in this case it is necessary to determine whether the Commission's rules are legislative or nonlegislative.[4] Legislative rules are those that are promulgated pursuant to a Congressional delegation of power to issue rules and regulations that have the force of law. Valid legislative rules are binding on the courts because they are the source of law that the court and agency must enforce. Legislative rules are valid unless "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Not all rules are of a legislative character, however. See the broad definition of "rule" in 5 U.S.C. § 551(4). Nonlegislative rules are those not promulgated pursuant to a power to issue regulations with binding effect; they are merely an expression of how the agency interprets and intends to enforce its governing statute, how it intends to exercise a discretionary function, or the procedure an agency intends to use in exercising its powers.[5] Nonlegislative rules do not have the same binding effect on the courts because they do not form the law which the courts enforce; the statute remains the source of the law. In the case of interpretative nonlegislative rules,[6] that

---

**3.** Petitioners brought this action initially to review the interim rules. We granted a stay of the interim rules pending our consideration of the case, and the ICC subsequently issued its final decision. As the final decision has superseded the interim action, the petition to review the interim rules is mooted and we therefore limit our review to the final rules. Hence, we find it unnecessary to grant the ICC's motion to dismiss the petition with respect to the interim rules.

**4.** The following discussion is drawn from these sources discussing the distinction between legislative and nonlegislative (or "interpretative") rules, and the differing standards of review: *Batterton v. Francis,* 432 U.S. 416, 425–26 & n. 9, 97 S.Ct. 2399, 2405–06 & n. 9, 53 L.Ed.2d 448 (1977) ("Legislative ... regulations are 'issued by an agency pursuant to statutory authority.... Such rules have the force and effect of law.' ... By way of contrast, a court is not required to give effect to an interpretative regulation."); *General Electric Co. v. Gilbert,* 429 U.S. 125, 141, 97 S.Ct. 401, 410, 50 L.Ed.2d 343 (1976); *Batterton v. Marshall,* 648 F.2d 694, 702 (D.C. Cir. 1980); *Chamber of Commerce v. OSHA,* 636 F.2d 464, 468 (D.C. Cir. 1980); *Joseph v. U.S. Civil Service Commission,* 554 F.2d

1140, 1153 & nn. 24–26 (D.C. Cir. 1977); *Shell Oil Co. v. FPC,* 491 F.2d 82, 88 (5th Cir. 1974). *See generally* 2 K. Davis, *Administrative Law Treatise* §§ 7:8, 7:11 (1979) [hereinafter cited as "*Davis Treatise*"]: K. Davis, *Administrative Law of the Seventies* § 5:03, pp. 146–59 (1976) [hereinafter cited as "*Administrative Law of the Seventies*"].

As Davis notes, the distinction is "deeply established" in federal court jurisprudence and in administrative law theory. *Administrative Law of the Seventies, supra,* at 149–50; *Davis Treatise, supra,* at 37.

**5.** Even though an agency may not have delegated power to issue legislative rules it necessarily has implied power to issue nonlegislative rules if it is empowered to enforce the terms of a statute or to exercise a discretionary function, because in order to carry out these lesser duties it must instruct its staff as to how it interprets the statute and how the discretionary function is to be carried out. *Administrative Law of the Seventies, supra,* at 147.

**6.** Most writers label the distinction drawn above in text as "legislative" versus "interpretative" rules. We prefer to use "nonlegislative" rather than "interpretative," because the

is, rules that give the agency's opinion as to what the governing statute means, the rules are advisory only and the court is free to substitute its own judgment for that of the agency. 5 U.S.C. § 706 ("the reviewing court shall decide all relevant questions of law [and] interpret statutory provisions"). Courts frequently, however, give great deference to an agency's nonbinding interpretative rules, upholding the rules if they are reasonable and consistent with past decisions. *See Davis Treatise, supra,* at §§ 7:13, 7:14. Thus, in practice it is often difficult, and frequently unnecessary, to determine which standard of review a court is applying.[7]

Here, however, it is necessary to determine whether certain of the Commission's rules are legislative or nonlegislative[8] because the standard of review normally applied to legislative rules is potentially altered in this instance by a recently added provision of the statute, which we now explain.

Congress in the Motor Carrier Act of 1980 intended to restrict significantly the discretion of the ICC to issue regulations enlarging on the motor carrier provisions of the Interstate Commerce Act. In its prefatory statement of findings and purpose Congress explained:

> the [ICC] should be given explicit direction for regulation of the motor carrier industry and well-defined parameters within which it may act pursuant to congressional policy; ... the [ICC] should not attempt to go beyond the powers vested in it by the Interstate Commerce Act and other legislation enacted by Congress.

Motor Carrier Act of 1980 § 3, 94 Stat. 793, *reprinted at* 49 U.S.C. § 10101 note. Congress carried out this purpose in different fashions in the various portions of the Act. For instance, concerning the issuance to motor carriers of certificates of authority to provide transportation service, Congress expressly withdrew a degree of rulemaking authority. *See* 49 U.S.C. § 10922(b)(3) ("The Commission may not make a finding relating to public convenience and necessity

latter label can be misleading. Not all nonlegislative rules interpret the statute. For example, an agency substantive direction to its staff on how to exercise a discretionary function or its rules prescribing procedures for carrying out agency functions may not purport to interpret the terms of the statute. Calling such rules "interpretative" can mislead because they are not necessarily reviewed under the same standard as are nonbinding rules that interpret a statute. (Discretionary functions, for example, are either reviewed for abuse of discretion, 5 U.S.C. § 706(2)(A), or not reviewable at all, *id.,* at § 701(a)(2).) Also, the procedures for the issuance of noninterpretative rules may differ. *See* 5 U.S.C. § 553(b) (providing an exception to notice and comment procedures for interpretative rules but not for "discretionary rules").

Our prior caselaw has recognized that not all nonlegislative rules are interpretative. *See Brown Express, Inc. v. U.S.,* 607 F.2d 695, 700 n. 5 (5th Cir.).

We recognize, however, that the need to discuss this distinction usually arises in the context of interpretative rules, as is the case here, and therefore we limit our discussion of nonlegislative rules to *interpretative* nonlegislative rules, particularly the proper standard of review and the required rulemaking procedures.

**7.** Although the [distinction] is ... clear ... the courts do not always bring the [distinc-

tion] into bold relief in determining what degree of authoritative effect to give particular rules. The theory is often blurred. The main source of the blurring may be the frequent failure of agencies to make clear whether rules are issued pursuant to their power to make law through rules or whether they are merely making interpretations instead of exercising delegated power. When a court finds that it cannot readily answer the question whether or not the agency has intended to exercise delegated power, the court may *skip that question and find another basis for decision;* the rule may be clearly valid if it is legislative and it may be easy to adopt if it is interpretative, so that a classification of it may be unnecessary.
*Davis Treatise, supra,* at § 7:13, p. 61.

**8.** This is true only with respect to the portions of the rules that concern the conditions for approval of rate bureau agreements, parts III, V, VI and VII *infra,* for it is only these portions of the rules over which there might be a significantly different standard of review. Other portions of the rules do not concern conditions of rate bureau agreement approval, *see* parts IV and VIII *infra,* and therefore are not affected by the presumption discussed below in text.

... based upon general findings developed in rulemaking proceedings."). Concerning approval of rate bureau agreements, however, Congress did not withdraw rulemaking authority but tempered that authority by creating a presumption that any additional rules are unnecessary. Under the prior provisions there were virtually no statutory conditions to the approval of a rate bureau agreement. Instead the ICC was given broad discretion to approve agreements "when it finds that the ... agreement will further the [national] transportation policy," *see* 49 U.S.C. § 10706(c) (now applicable only to non-rail and non-motor carriers), and was given broad power to require compliance with conditions it considered necessary to further that policy. Under the new provisions, Congress has established a detailed set of conditions for approval and has instructed that a rate bureau agreement *"shall be approved* by the Commission upon a finding that the agreement fulfills each requirement of [the statute], *unless* the Commission finds that such agreement is inconsistent with the [national] transportation policy." 49 U.S.C. § 10706(b)(2) (emphasis added). Congress explained in the legislative history the meaning of this change in emphasis:

> Under the [old] statutes, the [ICC] has substantial discretion in approving or disapproving rate bureau agreements.... [The new statute] is a clear example of Congress defining the limits which it believes the Commission should follow [and] reducing the discretion of the Commission to expand those limits. When the parties to an agreement meet all the conditions in the [statute], there is a presumption that the Commission should find the agreement to be in the public interest.

H.R. Rep. No. 1069, 96th Cong., 1st Sess. 27, 29, *reprinted in* 1980 U.S. Code Cong. & Admin. News 2283, 2309, 2311.

Contrary to petitioners' contentions, then, the Motor Carrier Act of 1980 has not virtually eliminated the ICC's legislative rulemaking authority over rate bureau agreements. The ICC retains the power to impose new conditions to further the national transportation policy. As the Commission concedes, though, "[i]t is apparent that a substantial change in the burden of proof associated with the approval of rate bureau agreements has been mandated by Congress." 46 Fed. Reg. 30093. The Commission's legislative power to prescribe additional conditions for agreement approval has been tempered with the presumption that new conditions the Commission imposes are unnecessary. This presumption is relevant to our standard of review as follows: If the Commission does not purport to exercise its independent rulemaking authority to create additional conditions but merely seeks to enforce the terms of the statute as it interprets them, then it has issued nonbinding, interpretative rules. The statutory terms remain the ultimate source for the duty imposed on the rate bureaus, and we are free to arrive at our own interpretation of those statutes, giving appropriate deference to the agency's views. If, however, the Commission purports to exercise its delegated authority to create new conditions that have the force of law, then the presumption described above attaches, for the Commission is going beyond the terms of the statute when its own rules are the source of the duty imposed on the rate bureaus.[9]

■ We must determine, then, the character of the Commission's rules. The es-

---

9. The precise effect of this presumption on our standard of review is unclear. Application of presumptions and burdens of proof in a legislative, rulemaking context is awkward and problematic because these are concepts developed in an adjudicative, factfinding context. *Cf., e.g.,* 49 U.S.C. § 10922(b)(1) (similar presumption applied in decision to issue motor carrier certificate of authority, but ICC prohibited from making decision in rulemaking). Possibly we would be essentially required to abdicate our normal "arbitrary and capricious" standard of review in which we defer to the rational conclusions and findings of the agency and would be required ourselves to weigh competing policies and to decide what is necessary to further the national transportation policy. Fortunately, we are not required to resolve how this presumption applies to rulemaking, for, as discussed below, we find that the Commission's

sence of the distinction between legislative and nonlegislative rules is the power the agency chooses to exercise in promulgating its rules. If it exercises its delegated power to make rules having the force of law, then the rules are legislative. Thus, we will listen carefully to the statements of the agency in its decision [10] and will honor its characterization if it reasonably describes what the agency in fact has done. *Administrative Law of the Seventies, supra,* at 148. Here the Commission's purpose was to interpret and implement the 1980 Act, not to impose new conditions that go beyond the Act. In its interim notice of rulemaking the Commission stated that "[i]n this proceeding the Commission will interpret and implement [the] new [statutory provision]." 45 Fed. Reg. 55734. The Commission intended the statute to be the sole source of duty. In its final decision the Commission ordered motor carrier rate bureaus to "file new or amended agreements *in conformity with the act as we have interpreted it* in this final decision." 46 Fed. Reg. 30093 (emphasis added). Nowhere does the Commission refer to its broad rulemaking authority or purport to create new law. Thus, it is clear that the Commission did not intend to issue new conditions with the force of law but was merely interpreting the statute, with the statute remaining the source of law. As discussion of the particular rules will disclose, this accurately reflects what the Commission in fact did.

See parts III, V, VI and VII, *infra.* Therefore, our standard of review is to determine whether the Commission's interpretation of the statute is correct, giving appropriate deference to its considered judgment and expertise. The presumption discussed above does not apply because the Commission has not attempted to go beyond the statutory conditions.

In making this determination that the Commission has not exercised its legislative rulemaking power we do not consider as conclusive the fact that the rules are phrased in mandatory terms. The Commission is charged with enforcement of the statute, and therefore it naturally instructed the rate bureaus as to their duties under the statute. Such mandatory instructions are not binding on the courts, however, if they merely interpret and implement the statute and do not create new law. Also, that these rules might have a substantial impact does not necessarily constitute them legislative rules. Nonbinding interpretations may have great impact and still remain nonlegislative. *Davis Treatise, supra,* at § 7:16; *Joseph, supra,* 554 F.2d at 1153 n. 26; *Energy Reserves Group, Inc. v. Department of Energy,* 589 F.2d 1082, 1094–95 (Emer. Ct. App. 1978).[11] In short, the essential inquiry is what the agency intends to do, for if it chooses to exercise its legislative rulemaking power, then that is what it has done.[12] Only with this determination made may we precisely review the substan-

---

rules that impose conditions on rate bureau agreements are not legislative rules and do not go beyond the statutory conditions.

**10.** Post hoc statements of counsel are much less persuasive. *Administrative Law of the Seventies, supra,* at 148.

**11.** It is a helpful aid, but not determinative, that the rules are phrased in an interpretative fashion. This is not conclusive because legislative rules may in a sense interpret the statute. For instance, if an agency is delegated the authority to issue binding interpretations of a statutory term or phrase, it may issue legislative rules that in a broad sense interpret the statute. *See, e.g., Batterton v. Francis,* 432 U.S. 416, 425–26, 97 S.Ct. 2399, 2405–06, 53 L.Ed.2d 448 (1977) (legislative rule interpreting

"unemployment"). Moreover, even if an agency is not specifically authorized to issue binding interpretations, it may be possible for an agency to do so under its general rulemaking power, if it so chooses.

**12.** Of course, the substance of the rule is not irrelevant to making this determination. The agency's characterization must reasonably comport with what it has in fact done. If, for instance, a rule creates a new duty that is not plausibly an interpretation of the statute, then it can only be considered a legislative rule. *See, e.g., Chamber of Commerce v. OSHA, supra,* 636 F.2d at 469. Also, we might find unconvincing an assertion that a rule is interpretative if it relates to broad terms of a governing statute whose meaning Congress meant to be articulated through legislative rulemak-

tive validity of the rules and the validity of the procedures used in their promulgation.

### III. The independent action rule

Rate bureaus deal with two types of rates, individual and collective, distinguished according to whether the rate is proposed unilaterally by an individual carrier or whether it is proposed after consultation among a group of carriers. If an individual rate is docketed with a rate bureau, that is, circulated among the subscribing public and carrier members prior to the bureau's filing the rate with the ICC, then independent action is potentially converted effectively into collective action because other carriers are given an opportunity to join in on the rate.

The statute provides that a bureau "may not interfere with each carrier's right of independent action." 49 U.S.C. § 10706 (b)(3)(B)(ii). In implementing this statutory requirement the ICC ruled that rate bureaus cannot require members who file their rates on bureau tariffs[13] to docket those rates with the bureau; otherwise there would be interference with the right of independent action. Thus, the Commission required that rate bureaus agree to allow members who file rates through the bureau to dictate whether or not they also want their rates circulated among other members prior to filing with the ICC. 46 Fed. Reg. 30093–97.

To understand the precise impact of this rule one must realize that unquestionably a bureau member has the right to bypass bureau procedures by filing its rates on its own tariff without the assistance of the bureau and without bureau docketing. Also, a carrier unquestionably has the right to compel bureau filing without obtaining bureau approval of the rate. What the Commission has decided, though, is that a bureau member also has the right to file its rates on bureau tariffs without giving other carriers an opportunity to participate in the rate.

The Commission's rationale for this interpretation of the unfettered right of independent action is that it will provide an incentive to decrease rates. Under the rule a carrier can decrease its rates with greater lead time over competing carriers and enjoy a limited period of competitive advantage because there is no advance notice of the proposed rate decrease through docketing. Without the rule a proposed rate decrease could be joined in by other carriers before it is filed with the ICC, and thus the initiating carrier would lose any competitive advantage or incentive to decrease rates.

The strongest challenge to the independent action rule comes from shippers who contend that it allows carriers to hide rate *increases* from the shipping public by burying them in the lengthy and complicated bureau tariffs and thus permits carriers to enjoy a period of supracompetitive pricing. These petitioners reason forcefully that when a rate increase is filed in a bureau tariff it is contained in thousands of pages of poorly organized tariff material that are impossible to survey in the 30-day waiting period before rates become effective. Thus, shippers are not aware of the increases before they take effect, with the result that they lose the opportunity to have the Commission reject or suspend and investigate the rate. Shippers might also endure supracompetitive charges for a period before they have an opportunity to locate another carrier. These petitioners observe that if a rate increase is docketed there is a longer notice period and the form of the notice is clearer, better organized and more accessible. Even without docketing, if a rate increase is filed in an individual carrier's tariff it will be more accessible because it is not buried in the thousands of pages of other bureau material.

In making its decision the Commission recognized the anti-competitive disadvantage from rate increases but concluded that the disadvantages would be outweighed by

ing, such as an "interpretation" of "reasonable rates."

**13.** A tariff is a schedule of rates.

the competitive advantages from rate decreases. The Commission reasoned that the shippers' fears were largely unfounded. According to the Commission, with competitive conditions in the industry carriers will realize that it is not advantageous to disguise rate increases in order to obtain a short period of supracompetitive prices because the shipper, once it discovers the increase, will then shift to another carrier. *Id.* at 30096–97. Moreover, the Commission expressed its intention "to monitor independent action docketing practices closely and take any necessary action if we detect a consistent pattern of noncompetitive behavior." *Id.* at 30096.

■ As outlined above, the Commission's independent action rule is but an interpretation of the statutory right of independent action. Thus, we are free to reach our own conclusion of the meaning of this phrase, 5 U.S.C. § 706, but we will give appropriate deference to the agency's conclusion. The degree of deference we give varies according to the strength of several factors. *See Batterton v. Francis, supra,* 432 U.S. at 425 n. 9, 97 S.Ct. at 2405 n. 9; *General Electric Co. v. Gilbert, supra,* 429 U.S. at 141–42, 97 S.Ct. at 410–11. We will give greatest deference to a reasonable interpretation that was reached after thorough consideration of the competing theories, that is consistent with the legislative history, that was rendered contemporaneously with the enactment of the statute by an agency charged with the enforcement of the statute, that is enforced consistently, and that concerns a matter of expertise or specialized knowledge peculiarly within the competence of the agency. *See generally,* cases collected in *Comment,* 47 U.Chi.L.Rev. 771, 786–87, 789–91 (1980). Under this standard the ICC's interpretation of the right of independent action is entitled to a good degree of deference.

■ The right of independent action was contained in the original Reed-Bulwinkle Act. In the 1950's the ICC issued several opinions to the effect that a waiting period before filing a proposed rate through bureau tariffs, designed to allow competing carriers to make concurrent rate adjustments, is advisory only and not mandatory. *Intercoastal Steamship Freight Association—Agreement,* 297 I.C.C. 759, 762 (1956); *Southern Motor Carriers—Agreement,* 297 I.C.C. 603, 609–10 (1956); *Central States Motor Common Carriers—Agreement,* 299 I.C.C. 773, 778–79 (1957). Therefore, the Commission's position is consistent with its past position, reached early in its enforcement of the antitrust immunity provisions.[14]

14. We recognize that the Commission's position concerning a mandatory, pre-filing waiting period has not always been consistent. Prior to its 1956 and 1957 decisions the Commission expressly rejected the contention that mandatory notice to other carriers conflicts with the right of unrestrained independent action. *Tobacco Transporters Freight Traffic—Agreement,* 288 I.C.C. 517, 520 (1953). (The Commission's attenuated explanation that *Tobacco Transporters* is consistent with the present interpretation is unconvincing. The cases it points to for reconciliation—*Western Traffic Ass'n—Agreement,* 276 I.C.C. 183, 210 (1949), and *Central States Motor Freight Bureau, Inc.—Agreement,* 278 I.C.C. 581, 584 (1950)—decided only that a bureau may not require a carrier to obtain bureau *permission* before filing, and do not directly address the issue of prefiling notice to other carriers and a waiting period.) Moreover, the Commission acknowledges that carriers have seldom, if ever, exercised their right to file rates through the bureau without docketing, 46 Fed. Reg. 30096, and the Commission continued to approve rate bureau agreements requiring docketing with only an "understanding" that this mandatory language is advisory.

Nevertheless, petitioners point to no Commission decision subsequent to the 1956 and 1957 cases that contradict its interpretation. Thus, we conclude that although the interpretation has not received continuous and long-standing enforcement, it is not inconsistent with the previous position.

Petitioners also object that the ICC's rule flatly contradicts a codified regulation that they read to require docketing of independent actions. 49 C.F.R. 1331.5 states:

When independent action is announced and tariff publication is to be made by a [rate bureau], notification thereof will be given by the [bureau] to the same extent and in the same manner that the [bureau] *gives notice* of [collective] actions. . . .

Second, the independent action rule was issued after thorough consideration of the competing considerations. *See* 46 Fed. Reg. 30093–97. Although the Commission's resolution of these competing policies is not free from doubt, its conclusion is not unreasonable. In particular, petitioners' contention that the rule should be limited to rate decreases in order to avoid the anticompetitive disadvantages from rate increases is not compelling. The Commission reasonably concluded that if the right of independent action includes the right to not docket rate decreases, it logically must also include the right to not docket rate increases, for the statute does not distinguish between the two types of actions. *Cf. Arizona v. Maricopa County Medical Society,* —— U.S. ——, ——, 102 S.Ct. 2466, 2475, 73 L.Ed.2d 48 (1982) (maximum price fixing is on the same legal, even if not same economic, footing as minimum price fixing).

Third, the interpretation is a valid construction of the statute and comports with general Congressional intent. Requiring carriers who undertake independent action through bureau filing to docket their rate proposals is reasonably viewed as a restriction of the freedom of independent action. Clearly the rule increases the prerogative of an independent actor. Congress considered the statute a "strict limitation upon rate bureau treatment of independent actions," H.R. Rep., *supra,* at 30, 1980 U.S. Code Cong. & Admin. News at 2312, and its general purpose in § 14 of the Act was to increase restrictions on rate bureaus by limiting the opportunities for collective rate-making and by encouraging more independence in formulating individual rates.

Finally, the Commission's decision was issued contemporaneously with the 1980 recodification and reemphasis of the right of independent action, and the operation of rate bureaus and the competitive conditions of the transportation industry are matters within the special expertise of the ICC. In short, we find no compelling reason to depart from the Commission's interpretation.

IV. Special permission authorities

49 U.S.C. § 10762(c)(3) requires that a proposed rate change filed with the ICC not become effective until 30 days after the rate is filed, published, and held open for public inspection. This mandatory 30-day waiting period may be reduced by the Commission, however, "if cause exists." *Id.* at § 10762(d)(1). A finding of cause is known as a "special permission authority." In the past the ICC regularly issued standing special permission authorities to rate bureaus, which allowed their members to enforce on only five days notice rate reductions designed to meet reductions established by the independent action of other bureau members. If this practice were continued bureau members could avoid the purpose of the independent action rule by filing matching rate reductions that take effect within only five days, depriving an initiating carrier of most of its competitive advantage. Therefore, the ICC cancelled all existing special permission authorities of this nature and made clear that they would no longer be issued. 46 Fed. Reg. 30096, 30106.

This action is challenged on the ground that it was taken in violation of the Administrative Procedure Act's requirement that notice and an opportunity to comment on

---

The purpose of this rule was to require rate bureaus to give notice to the shipping public of independent actions, as they were already required to do so of collective actions, because notice to the shipping public was deemed essential for collective actions and docketed independent actions have the potential of taking on the character of collective actions. *See Notice of Independent Action,* 332 I.C.C. 22 (1967). Thus, the Commission in its decision construed this regulation to apply only where an independent action is docketed; in such a case, notice

must be given equally to shippers as to other carriers. 46 Fed. Reg. 30095. Where independent action is not docketed, there is no opportunity for the rate to become collective action, and therefore the regulation does not apply. Thus construed, the regulation is not inconsistent with the independent action rule. The Commission's interpretation of its own regulation, to which we give particular deference, is reasonable, for the regulation applies by its own terms only when an independent action "is announced," i.e., docketed.

proposed rules be given before the rules are adopted. 5 U.S.C. § 553(b). The ICC indeed gave no notice that it intended to change its past practice concerning these special permission authorities.[15] Its only justification [16] is that because it may cancel the discretionary authorities informally and without a hearing, it need not undertake rulemaking procedures. In essence, the Commission's contention is that its decision was not a rule of general and prospective application but instead a series of decisions in discrete cases to cancel, all taken at the same time.

■ While a decision in a particular case or cases to revoke a special permission authority would not be rulemaking, the decision to reverse a longstanding and uniform practice by revoking all outstanding authorities of a particular type and implicitly indicating that no such authorities will be issued in the future is clearly a rule. Such a decision is, in the terms of the Administrative Procedure Act, "an agency statement of general ... applicability and future effect designed to implement ... or prescribe law." 5 U.S.C. § 551(4). In *Brown Express, Inc. v. U.S.*, 607 F.2d 695, 699–702 (5th Cir. 1979), the former Fifth Circuit held. that where the ICC announced that it would discontinue its long-standing informal practice of giving competing carriers notice before issuing emergency temporary operating authority, the agency had engaged in rulemaking that required notice and comment. This is a similar case, and the fact that the prospective announcement affects a discretionary function does not deprive it of its rulemaking quality. It is rulemaking both because an informal rule established by long-standing practice was rescinded, that of routinely granting the special permission authorities described, and because a new rule was announced, that of not issuing authorities that would allow competing carriers to frustrate the competitive advantage gained from independent action without docketing. Therefore, the rule is invalid for failure to comply with the APA's notice and comment provisions.

## V. Industry average costs

The most fundamental change in rate bureau practices accomplished by the Motor Carrier Act of 1980 was to place two primary restrictions on collective ratemaking activities. First, effective January 1, 1981, no carrier may *vote* on a rate proposal unless that carrier is authorized to provide the transportation service affected,[17] 49 U.S.C. § 10706(b)(3)(B)(i)(II), although any carrier may continue to *discuss* any rate proposal, *id.*, at § 10706(b)(3)(B)(i)(I). The second restriction, which takes effect January 1, 1984,[18] is that there can be *no discussion or voting* on "single-line rates." *Id.* at § 10706(b)(3)(D). "Single-line rates" are rates proposed by a single motor carrier

---

15. The ICC contends that notice of the rule was given because cancellation of the authorities was necessarily inherent in allowing independent carriers to file without advance notice. No mention was made of the matter of special permission authorities, however, only of the docketing procedure. Therefore, the Commission's notice did not "fairly appraise interested *persons*" that *this action was being considered. See Bonney Motor Express, Inc. v. U.S.*, 640 F.2d 646, 650 (5th Cir. 1981).

16. 5 U.S.C. § 553(b)(B) provides an exception from notice and comment procedures "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and [comment] are ... unnecessary...." Because the issues concerning special permission authority revocation appear to be identical to the issues concerning the independent action rule, and because parties had an opportunity to file objections in reconsideration of the ICC's decision but failed to do so, the Commission might have contended that this rule falls within the good cause/unnecessary exception. It makes no such contention at this point, however, and so we are not called upon to rule on the availability of this exception.

17. The requirement for voting is not that the carrier actually participate in the rate but only that it is authorized to provide the service.

18. The effective date is potentially delayed until July 1, 1984 under certain conditions. *See* 49 U.S.C. § 10706(b)(3)(D).

applicable only over its line. *Id.* at § 10706(b)(1). Single-line rates are distinguished from "joint-line rates," which are rates that apply over the lines of two or more carriers, made by agreement between the carriers. 49 C.F.R. § 1310.0(f)(16) (1981). There is an important exception to these two restrictions. Changes in tariff structures and general rate increases or decreases do not fall within these two restrictions if discussion of such changes or rates is limited to "industry average carrier costs" and after 1984 if discussion does not include "individual markets or particular single-line rates." *Id.* at § 10706(b)(3)(D)(i) and (iii).

The Commission ruled that "general rate increases and decreases [19] may be discussed and voted on only if ... discussion is limited to industry average carrier cost information," and that "discussion of changes in tariff structure ... is limited to industry average carrier cost information." 46 Fed. Reg. 30103. Two objections are made to this rule. First, some petitioners contend that because the voting and discussion restrictions to which the tariff restructuring and general rate change exception applies do not take effect until 1984, the exception and accompanying industry average costs limitation do not take effect until then. This is clearly incorrect for only one of the two restrictions on collective ratemaking is delayed until 1984. The restriction on voting to those authorized to provide the service affected is effective now, and so must be the exception.

The second challenge is that it is illogical and absurd to limit discussion to industry average costs. Petitioners contend that the statute means that *when* costs are discussed only industry average information may be used, but that the statute could not mean that only cost information may be discussed. A host of factors are relevant to general rate changes such as the demand for services and shippers' ability to pay; moreover, tariff restructuring may not involve cost or revenue information at all where it is undertaken only to simplify the tariffs and not to change the rates.

Despite the apparent strength of this argument the industry average cost rule is valid. First, the rule simply tracks the language of the statute, and it would be anomalous indeed to strike down a rule that only attempts to implement the precise wording of the governing statute, the validity of which has not been challenged. If application of the statute produces absurd results in some situations, this is not a concern at this point, but is a matter to be addressed on a case-by-case basis as the meaning of the statute is fleshed out. *Cf. American Trucking Association, Inc. v. ICC,* 659 F.2d 452, 461 (5th Cir. 1981) ("[w]e ...

---

**19.** The Commission defined "general increase" as "a proposed general adjustment of substantially all the rates published in a *rate bureau's* tariff or tariffs." Such a definition does not appear to comport with Congressional intent, however. Congress defined general rate increases or decreases as those rate changes "that are applicable to all rates charged by *one or more carriers.*" H.R. Rep., *supra,* at 28, 1980 U.S. Code Cong. & Admin. News at 2310. It is clear that Congress envisioned "general rate changes" and "single-line rates" as overlapping concepts, for it stated that "the bill recognized that general rate increases are applicable to single-line rates as well as joint-line rates." *Id.* Thus, by creating the exception to single-line rates for general rate changes, it appears Congress meant to impose greater restrictions on "specific" or "individual" single-line rates than on "general" single-line rates. This reading is supported by the statute, where

Congress allowed discussion of general rate changes so long as "*particular* single-line rates" are not discussed, 49 U.S.C. § 10706(b)(3)(D)(i), and in the legislative history where the House Report refers to "*specific* single-line rates" and "*individual* single-line rates."

In short, both the Commission and Congress agree that a rate change is "general" only if it affects all commodities. The Commission evidently believes, though, that a change is general only if it also affects substantially all bureau rates, while Congress evidently viewed general rate increases as potentially affecting only a single carrier. Because this issue has not been raised by petitioners, however, we do not definitively rule on it. We discuss the issue only because it is helpful to an adequate understanding of these intricate statutory provisions.

decline to hypothesize such possible consequences of the rules should they be so applied"). Second, the Commission's interpretation of the statutory language may not be as harsh as petitioners fear. In its decision the Commission stated that "some of the topics of discussion [other than costs] suggested by the Rate Bureaus, such as the need for an increase or its lawfulness, would be inextricably involved in a full discussion of costs." 46 Fed. Reg. 30103.

Finally, the limitation on discussion to industry average costs is not manifestly unduly restrictive because it does not apply to every general rate change or tariff restructuring. It only applies to the extent that the bureau seeks to come within the exception to one of the two limitations on collective ratemaking. For instance, if a general rate increase is proposed that is not a single-line rate and voting is limited to those carriers authorized to provide the service affected, then neither of the two statutory restrictions applies and therefore it is not necessary to meet the limitation within the exception to the two restrictions. A second example where the exception might not be necessary is a tariff restructuring that does not change the substance of any rates, because the two restrictions on collective ratemaking apply only to "single-line *rates*" and "*rate* proposals."

For these reasons we find nothing unreasonable in the Commission's decision to implement directly the wording of the statute.

### VI. Sound recordings

The statute provides that a rate bureau "must admit any person to any meeting at which rates or rules will be discussed or voted upon." 49 U.S.C. § 10706(b)(3)(B)(v). Congress stated that this "provides for total sunshine on discussion and voting." H.R. Rep., *supra*, at 30, 1980 U.S. Code Cong. & Admin. News at 2312. The Commission ruled that "admission to meetings cannot be contingent upon compliance with any conditions or procedures. Thus, the unconditional right to attend meetings . . . includes the right to take notes or use recording devices provided the conduct of the meeting is not disrupted." 46 Fed. Reg. 30099.

▮▮ The Commission reasonably read the statute to impose an unconditional right to attend, for Congress characterized the statute as a "total sunshine" law. Banning any sound recording would be a condition on the "total sunshine" concept. The Commission's rule is a natural and logical extension of the unchallenged rule that the right to attend includes the right to take notes. This interpretation was contemporaneous to the enactment of the statutory requirement of open meetings, which the Commission must enforce. Thus, there are sufficient factors present for us to defer to this interpretation.

### VII. Changes in released rates

There exists a category of rates known as "released rates" that charge a lesser rate in exchange for a limitation or "release" of the carrier's normal liability for damage to commodities carried. 49 U.S.C. § 10730. The Motor Carrier Act of 1980 banned discussion or voting on released rates but created an exception for "change" to existing released rates; such changes may be discussed or voted on until January 1, 1984. 49 U.S.C. § 10706(b)(3)(C). The statute and the legislative history do not define what is a change in an existing released rate and what is a new released rate. Without giving notice that it was considering this subject matter the Commission issued in its final decision the interpretation that only a change in the amount charged is a change to an existing rate within this exception, and that changes in the geographic or commodity coverage of rates are not changes to existing rates but are new released rates. 46 Fed. Reg. 30104.

▮▮ Petitioners challenge this rule first on substantive grounds. They contend that the rule is unreasonably restrictive because it prohibits collective geographic and commodities changes of even a trivial or minor nature. We choose to defer to the Commis-

sion's interpretation. First, it is a contemporaneous construction of the statute that the Commission is empowered to enforce, and it concerns a matter within the Commission's particular expertise—the concept of what a rate is. Second, the interpretation does not appear to be unreasonable. Clearly, any change in the amount charged is merely a change in an existing rate. However, if carriers were allowed to freely make collective, large-scale changes to the commodities and territory affected by a released rate, they could easily circumvent the prohibition. Third, the interpretation is not unduly restrictive as applying to even trivial changes, for in its brief to this court the Commission construes its decision as applying to "new routes" and "substantial revisions."

■ Petitioners also challenge the lack of notice and opportunity to comment required by the APA, 5 U.S.C. § 553(b), (c). An exception to the notice and comment procedures exists, though, for "interpretative rules, general statements of policy, or rules of agency ... procedure." *Id.* at § 553(b)(B). We find that the released rate rule falls within the "interpretative" exception because it is a nonlegislative rule that interprets the statute and it does not have a "substantial impact."

■ As discussed earlier in this opinion, rules that in some sense interpret the statute might be either legislative and therefore binding on the parties and the courts, or nonlegislative and therefore only advisory (but entitled to deference), depending on whether or not the agency has chosen to exercise its delegated power to issue rules with the force of law. Earlier this distinction was used to determine the proper substantive standard of review. This distinction also determines whether a rule is "interpretative" for purposes of the exception to the notice and comment requirements of the APA. In *Brown Express, supra,* 607 F.2d at 700, the former Fifth Circuit con-

trasted interpretative rules within the exception with "legislative rules ... which create law." The legislative/nonlegislative distinction has been employed in several other cases for defining the extent of the interpretative rule exception. *See, e.g., Batterton v. Marshall, supra,* 648 F.2d at 702–09; *Chamber of Commerce v. OSHA, supra,* 636 F.2d at 468–71; *Joseph, supra,* 554 F.2d at 1153 & nn. 24–26. This is a sensible fashion in which to interpret the exception, for where rules that in some sense interpret the statute are issued as legislative rules parties affected should have a prior opportunity to comment on them because they and the courts will be bound by them. By contrast, nonlegislative interpretative rules are advisory only (although due some deference) and may be challenged by the parties in court. Therefore, there is not the same need for a prior opportunity to comment. *See Chamber of Commerce v. OSHA, supra,* 636 F.2d at 470–71. *Cf. Comment,* 43 U. Chi. L. Rev. 430, 446–47 (1976).

As discussed above, the released rate rule is nonlegislative, *see* text at note 10 *supra,* and it is clearly an interpretation of the statute. Therefore, it falls within the primary definition of an interpretative rule.

Despite the interpretative nature of a rule many courts have enforced notice and comment procedures where the rule has "substantial impact." *See* discussion and cases collected in *Davis Treatise, supra,* at § 7:17. This court has never expressly endorsed the substantial impact approach to interpretative rules, although we have applied it to procedural rules, the third in the trio of exceptions, *Brown Express, supra,* 607 F.2d at 701–02, and courts usually do not distinguish among these three exceptions for purposes of the substantial impact test, *see Firestone Synthetic Rubber & Latex Co. v. Marshall,* 507 F.Supp. 1330, 1335 n. 7 (E.D. Tx. 1981). There are significant theoretical difficulties in applying the sub-

stantial impact test, however,[20] and therefore we avoid endorsement of it at this time. Instead, we assume *arguendo* that this approach is applicable and find that the released rate rule does not have substantial impact for purposes of notice and comment.

Petitioners have not shown the Commission's interpretation of the released rate provision to have the type of substantial impact that courts have previously found required notice and comment. First, the rule is a fresh interpretation of a new statutory provision and therefore is not a "depart[ure] from existing practice." *Brown Express, supra,* 607 F.2d at 702. Some interpretation of the statute is necessary, and the Commission has simply chosen one of several possible interpretations; petitioners do not contend that their preferred interpretation is a radically different one. Also, petitioners have not explained in concrete terms what effect the interpretation has on them. We do not know how many released rates there are, how important these rates are to the operation of carriers, or the significance of the difference between changing these rates by independent action rather than by collective action. From the ma-

terial before us the matter seems much less significant than other issues in this case, for all that is at stake is the extent to which carriers may collectively as opposed to independently change existing released rates until January 1, 1984; after this date the rule becomes irrelevant because all collective activity concerning released rates is prohibited. In sum, there has been no demonstration that the rule "drastically effect[s] vital interests," *Administrative Law of the Seventies, supra,* at 194, or otherwise has the type of impact that requires notice and comment.

## VIII. Enforcement

The ICC ruled that it will enforce the rate bureau provisions by rejecting bureau tariffs where there is "proof of significant violations" of an approved agreement and by suspending and investigating rates where there are "allegations of lesser violations." 46 Fed. Reg. 30105–06. The recently-established employee board known as the Tariff Integrity Board ("TIB"), *see* 49 C.F.R. § 1100.22a, will entertain all allegations of rate bureau agreement violations.[21]

■■■ Petitioners first assert that the Commission may enforce the rate bureau

---

**20.** The substantial impact test is typically reasoned under two different theories: as a gloss on the statutory exception for "interpretative" rules, the *statute* requires notice and comment even though a rule is "interpretative" if it has substantial impact; as a judicially-created procedural requirement, notice and comment procedures are imposed *in addition to* the requirements of the APA if demanded by fundamental fairness. *See Davis Treatise, supra,* at § 7:18. The first theory has been criticized as unsound. *Id.,* 1982 Supplement at 127 (criticizing *Brown Express, supra* ); *Administrative Law of the Seventies, supra,* at 193. The second theory is put in doubt by the Supreme Court's decision in *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 524, 98 S.Ct. 1197, 1202, 55 L.Ed.2d 460 (1978), where it stated that courts may add on to the APA procedural requirements only in "extremely rare" or "extremely compelling" cases. *See Energy Resources Group, Inc. v. Department of Energy,* 589 F.2d 1082, 1096–98 (Emer. Ct. App. 1978) (holding that *Vermont Yankee* precludes substantial impact test); *Davis Treatise, supra,* at §§ 6:35–36, 7:19, and 1982 Supplement at 127–47 (attempting to write off the *Vermont Yankee* "dictum").

In addition to the two principal theories it is also possible that the substantial impact test is not distinct from the initial determination of whether a rule is "interpretative" but is subsumed within this determination as a factor in determining whether a rule is "legislative." *See* discussion in text preceding note 11 *supra.* If this is the only role of the substantial impact test it has a much decreased significance, for as explained above the substantial impact of a rule is only one, weakly relevant consideration in the legislative rule determination. *Id.*

**21.** In its final decision the Commission originally stated that the TIB would forward complaints to the Office of Consumer Protection for investigation, and then "may act" after receiving the results of the investigation, or may send its recommendation to the Commission for possible action. 45 Fed. Reg. 30106. In its "Clarification and Errata," however, the Commission deleted the quoted language and apparently restricted the TIB's role to only that of recommending action to the Commission. *Id.* at 30108–09.

provisions only by terminating approval of the agreement and not by finding unlawful rates issued in violation of the agreements. They rely on *Keogh v. Chicago & N.W. Ry. Co.*, 260 U.S. 156, 162, 43 S.Ct. 47, 49, 67 L.Ed. 183 (1922), which held that the ICC may not award damages for carrier violations of the antitrust laws if their rates otherwise complied with the Interstate Commerce Act. *Keogh* does not prevent the Commission's enforcement scheme. When *Keogh* was decided the Reed-Bulwinkle Act had not been enacted, and therefore the Commission was attempting to enforce only the antitrust laws, a matter not within its delegated powers. By contrast, here the Commission is enforcing only the provisions of the Interstate Commerce Act, which it is broadly empowered to do. 49 U.S.C. § 10321(a). That one means of enforcing the rate bureau provisions is specified in the Act—termination of agreement approval—does not itself preclude other means, for "enumeration of a power of the Commission ... does not exclude another power the Commission may have in carrying out [the Act]." *Id.*[22]

Petitioners next contend that although the Commission might be able to find rates unlawful for failure to comply with rate bureau agreements, it may not do so under the rejection power, because that power is reserved solely for technical defects in filing formalities, such as the failure to properly symbolize rate changes. Although filing defects are the primary focus of the rejection power, *see* 49 U.S.C. § 10762(e); *Southern Motor Carriers Rate Conference v. U.S.*, 676 F.2d 1374, 1376 (11th Cir. 1982) (discussing rejection for publication errors), courts have frequently held that the power is not strictly limited to these defects. The

seminal case is *Municipal Light Boards v. FPC*, 450 F.2d 1341, 1346 (D.C. Cir. 1971), *cert. denied*, 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972), whose reasoning we adopt here:

> [Rejection] is a peremptory form of response to filed tariffs, ... appropriate where the filing is so deficient on its face that the agency may properly return it to the filing party without even awaiting a responsive filing by any other party in interest. ... Its use is not limited to defects of form. It may be used by an agency where the filing is so patently a nullity as a matter of substantive law, that administrative efficiency and justice are furthered by obviating any docket at the threshold rather than opening a futile docket. ... [A] rate filing may be rejected both when the governing statute explicitly provides for rejection and when it does not. The Commission ha[s] authority to issue a regulation ... for the rejection of filings that patently fail to establish substantial compliance with [the Act and] duly issued regulations. This rests on its basic statutory authority to issue regulations ... to carry out the provisions of the Act.

*Accord, United Gas Pipeline Co. v. Mobile Gas Service Corp.*, 350 U.S. 332, 347, 76 S.Ct. 373, 382, 100 L.Ed. 373 (1956) ("There can be no doubt of the authority of the Commission to reject [an] unauthorized filing under its general powers to issue orders 'necessary or appropriate to carry out the provisions of this Act.'"); *North Central Truck Lines, Inc. v. ICC*, 559 F.2d 802, 804–05 (D.C. Cir. 1977); *Delta Airlines, Inc. v. CAB*, 543 F.2d 247, 264 (D.C. Cir. 1976); *W.J. Dillner Transfer Co. v. U.S.*, 214 F.Supp. 941, 946 (W.D. Pa. 1963).[23]

---

22. Our conclusion is supported by the Seventh Circuit's recent decision in *Board of Trade v. ICC*, 646 F.2d 1187, 1192 (7th Cir. 1981), holding that the Commission must find that a rate is unlawful if published in violation of the rate bureau agreement. Although we do not necessarily endorse the mandatory aspect of this holding, the court's reasoning demonstrates, as we have concluded, that compliance with the

agreement is a proper subject for Commission consideration in reviewing the legality of rates.

23. So long as rejection is exercised before the tariff becomes effective the principal concern is only a procedural one—whether the nature of the defect merits this peremptory procedure. Because the Commission has chosen to use the TIB, which proceeds by investigation and com-

■ Petitioners' third line of attack is a successful one. The Tariff Integrity Board procedures which the Commission invoked allow for the rejection or suspension and investigation of tariffs after the tariffs become effective.[24] In *Southern Motor Carriers, supra,* we considered a challenge to the TIB procedures and held that the Commission may not reject tariffs after they are effective using the TIB "informal complaint" procedures.[25] Thus, we reserved the issue of whether effective tariffs may be rejected using *formal* complaint procedures. 676 F.2d at 1379 n. 14. The Commission contends that its present decision envisions formal complaint procedures before the Commission prior to rejection of any tariff. Therefore, we must decide whether the Commission may ever reject or suspend effective tariffs. We hold that it may not.

It is necessary to understand the precise role of rejection and suspension within the range of enforcement powers under the Act. Carriers within the jurisdiction of the Act ("common carriers") are required in order to offer service to file tariffs containing their rates, and must charge and collect the amounts contained in the filed tariffs, no more and no less. 49 U.S.C. §§ 10761, 10762. If a filed and effective tariff is found by the Commission after investigation and a hearing to be unlawful, the Commission may order compliance with the Act in several fashions, including prescribing

the proper rates and awarding damages for violation of the Act. *See* 49 U.S.C. § 10704(b)(1) (prescription); § 11701 ("appropriate action"); § 11705(b)(3) (damages). Because these corrective powers do not prevent unlawful rates from their inception the Commission also has the power to suspend a rate for a limited time before it becomes effective in order to investigate it for lawfulness. *U.S. v. Chesapeake & Ohio Ry. Co.,* 426 U.S. 500, 513, 96 S.Ct. 2318, 2325, 49 L.Ed.2d 14 (1976) (the "purpose [of suspension] [i]s to give the Commission 'full opportunity for . . . investigation *before* the tariff becomes effective' ") (emphasis in original).[26] Similarly, the Commission may reject a tariff submitted where there are obvious defects such that investigation and a hearing are unnecessary. 49 U.S.C. § 10762(e). As we explained in *Southern Motor Carriers, supra,* 676 F.2d at 377–78, the plain meaning of rejection is to refuse to receive. It has been held that "rejection is a regulatory device properly used only *prior* to a tariff's effective date, . . . [and] an investigation is the only mechanism available for challenging *effective* tariffs." *Delta Air Lines, Inc. v. CAB,* 543 F.2d 247, 268 (D.C. Cir. 1976) (emphasis in original). *See also Alaska Pipeline Co. v. U.S.,* 436 U.S. 631, 640, 98 S.Ct. 2053, 2059, 56 L.Ed.2d 591 (1978) (stating that once a rate becomes effective, "the only relief against unreasonable rates [lies] in the reparations [damages] remedy").

plaint procedures, perhaps the range of substantive issues that may be addressed through rejection is somewhat broader than that established by the "patent nullity" standard discussed in text. This standard should be considered as applicable to classical, threshold rejection; the degree of obviousness required for modified procedures is reserved for future decision.

24. Action may be initiated within 60 days after the tariff takes effect, and there is no time limit on completion of the proceedings. *Southern Motor Carriers, supra,* 676 F.2d at 1376, 1378 n. 12.

25. A complaint, answer and response are allowed, but there is no discovery, compulsory process, or administration of oaths.

26. The suspension provision, 49 U.S.C. § 10708, requires by its own terms that this action be taken before the rate becomes effective. Quoting without ellipses, this provision states:

The Commission may begin a proceeding to determine the lawfulness of a proposed rate immediately when a new rate is filed. The Commission may take whatever final action as it could in a proceeding begun after a rate became effective. Pending final action in [such] a proceeding, the Commission may suspend the proposed rate at any time for not more than 7 months beyond the time it would otherwise go into effect. If the Commission does not take final action during the suspension period, the proposed rate is effective at the end of that period.

As further explained in *Southern Motor Carriers,* there are compelling reasons to restrict rejection to the period before a rate becomes effective. Because a carrier may charge only the rates on file, and because rejection has the effect of declaring a rate void *ab initio* as if never filed, rejection necessarily carries with it a right to refund for overcharges (in the case of rate increases), measured always by the preexisting rate.[27] This undermines the uniformity and reliability interests that the system of tariff filing was meant to foster. In the words of the Supreme Court:

> To adopt such a rule and arbitrarily measure damages by [overcharges] would create a legalized but endless chain of departures from the tariff; ... would destroy the equality and certainty of rates; and contrary to the statute, would make the carrier liable for damages beyond those inflicted....

*Davis v. Portland Seed Co.,* 264 U.S. 403, 421, 44 S.Ct. 380, 383, 68 L.Ed. 762 (1924) (holding that illegality does not render rate nonexistent or subject carrier to liability for overcharges).

Review of the statute, the major decisions, and policy, then, leads us to conclude that rejection or suspension after a tariff becomes effective is in conflict with the statute and thus may not be done either as an interpretation of the statutory powers or by independent rulemaking. The only decisions to shed doubt on this conclusion are two lines of cases noted in our *Southern Motor Carriers* case, *supra,* 676 F.2d at 1379–80. Neither is controlling.

In *Acme Fast Freight, Inc.,* 17 M.C.C. 549, 556–57 (1939), *sustained,* 30 F.Supp. 968 (S.D.N.Y.), *aff'd,* 309 U.S. 638, 60 S.Ct. 810, 84 L.Ed. 993 (1940), the Commission found that rates filed with it that had become effective were illegal and ordered them re-

jected and stricken from its files. This is a limited precedent, however. The reason for illegality was that the filing party was not a common carrier within the jurisdiction of the Act and thus the rates "[w]ere not required by the statute to be filed, [the Commission was] not bound to accept them, and ... [they had] no proper place in [its] files." 17 M.C.C. at 555. This is an unexceptional result that allows the Commission to toss out irrelevant and unnecessary material because the filing party is not within its jurisdiction. This action does not have the same unsettling effect as rejection of a tariff filed by a common carrier; where the filing party is not within the Commission's jurisdiction it is not prevented from charging whatever rates it pleases for its non-common carrier services and is not liable for overcharges. This case, then, does not establish the general rule that rejection may be used at any time against illegal tariffs.

The second precedent is *Chicago, M. St. P. & P.R. v. Alouette Peat Products,* 253 F.2d 449 (9th Cir. 1957), which holds that an illegality in an effective tariff subjects the carrier to liability for overcharges. By implication, this supports rejection of effective tariffs, for as discussed above overcharge liability is a necessary corollary to rejection. We hold on the basis of persuasive and controlling authority, however, that *Alouette Peat* was wrongly decided.

We begin with an explanation of the distinction between overcharges and damages or reparations. Overcharges are awarded "for amounts charged that exceed the applicable rate ... contained in a tariff filed under [the Act]." 49 U.S.C. § 11705(b)(1). Damages or reparations are awarded for violations of the Act, and are not necessarily measured against any existing or former tariff. *Id.* at § 11705(b)(2), (3).[28] To illustrate, if the Commission were to find after

---

**27.** Even if this were not logically necessary the Commission's regulations appear to require it. *See Southern Motor Carriers, supra,* 676 F.2d at 1377 & n. 7. *See also Shoebe, Inc. v. Bowman Transportation, Inc.,* 350 I.C.C. 664, 670

(1975) ("The penalty for rejection is exclusive: the voiding of the tariff.") (ellipses omitted).

**28.** The Supreme Court has explained:
[A] clear distinction [is made] between overcharges and damages ... under the [Inter-

a full hearing that the maximum allowable rate increase is 12%, and then a carrier were to unlawfully increase its rates 14%, a shipper who pays the 14% increase may not recover "overcharges" measured against the old rate, for the 14% increase, although illegal, took effect and was the applicable rate. However, the shipper may recover *damages* of 2% for the carrier's violation of the Commission's order, measured by the difference between the lawful 12% rate increase and the rate in fact charged. This was the result in *Genstar Chemical Ltd. v. ICC,* 665 F.2d 1304 (D.C. Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982).

*Alouette Peat Products* was a case on all fours with *Genstar.* The carrier increased rates more than the 6% allowed by the Commission. Instead of awarding damages of only the difference between the rate charged and the rate allowed, however, the court awarded overcharges measured from

the old rate that previously had been in effect. This decision seems to us internally inconsistent,[29] contrary to the statute and consistent Commission decisions,[30] and in conflict with Supreme Court precedent.[31] It has caused confusion even within the agency for a quarter century.[32] We therefore decline to follow *Alouette Peat,* as the D.C. Circuit declined to follow it in *Genstar, supra,* 665 F.2d at 1309.[33]

In conclusion, providing more formal procedures does not cure the essential defect in rejecting or suspending effective tariffs, namely, that the statute and caselaw limits these powers to use against only proposed tariffs. To the extent that the Commission's decision conflicts with this holding it is reversed.

The Commission's decision is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings not inconsistent with this opinion.

---

state] Commerce Act. For if the plaintiff here had been required to pay more than the tariff rate, it could have recovered the excess, not as damages, but as overcharges. . . . [But if the shipper paid the tariff rate and,] as a fact, the rates were unreasonable, the shipper was nevertheless bound to pay, and the carrier to retain, what had been paid, leaving . . . to the [shipper] the right to apply to the Commission for reparation.
*Davis v. Portland Seed Co., supra,* 264 U.S. at 420, 418, 44 S.Ct. at 382.

**29.** At one point the court stated that "the increased rates were the *applicable* rates to be applied to the shipments in question." Later the court stated that "[n]o change having been legally made in the rate which existed before [the increase], [the old] rate was the only existing, legally established rate and the Court was bound to apply it." 253 F.2d at 455, 456 (original emphasis).

The court stated that "the shipper was entitled to recover the difference between what he had paid and what the Commission found to be the *reasonable rate*" (i.e., the approved increase). In its next breath, the court stated that the shippers were "entitled to recover the difference between what they had paid and the *lawfully established rate*" (i.e., the old rate). *Id.* at 455 (emphasis added).

**30.** *See* discussion *supra* regarding the statute, and cases collected in *Southern Motor Carriers, supra,* 676 F.2d at 1379, and in *Genstar, supra,*

665 F.2d at 1308, concerning Commission precedents.

**31.** *Portland Seed Co., supra,* 264 U.S. 403, 44 S.Ct. 380. *See* note 28 *supra.*

**32.** *Compare Shoebe, Inc. v. Bowman Transportation, Inc.,* 350 I.C.C. 664, 670 (1975) (*Alouette Peat* "did not hold that the tariff was void"), *with Phillips Petroleum Co. v. Akron, Canton & Youngstown RR. Co.,* 308 I.C.C. 257, 259 (1959) (in *Alouette Peat,* "rates . . . were declared to be illegal and void").

**33.** In disapproving *Alouette Peat,* we note two matters that we do not face and therefore do not decide. First, we do not decide whether the proper measure of damages for a statutory violation can ever be the difference between the rate charged and the previous rate. *See Genstar, supra,* 665 F.2d at 1309 n. 3. Also, because the statute of limitations for damages recovery is shorter than for overcharges recovery, the Commission has chosen to expand the concept of overcharges for purposes of awarding a damage remedy where necessary to obtain the longer limitations period. *See H.J. Baker & Bros. Inc.,* 357 I.C.C. 640 (1978) (on facts identical to *Genstar,* calling the action one for overcharges, but awarding only 2%, not 14%). We do not pass on the validity of this reasoning.