In re Algeria **PERKINS**, Debtor.

Algeria **PERKINS**, Plaintiff,

v.

**MID–PENN CONSUMER DISCOUNT COMPANY**, Defendant.

Bankruptcy No. 88–13880S.
Adv. No. 89–0664S.

United States Bankruptcy Court,
E.D. Pennsylvania.

Nov. 9, 1989.

Andre H. Madeira, Community Legal Services, Inc., Law Center North Cent., Philadelphia, Pa., for debtor/plaintiff.

Edward Sparkman, Philadelphia, Pa., Standing Chapter 13 Trustee.

Edward Seave, Philadelphia, Pa., for defendant.

OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

## A. INTRODUCTION.

One of the philosophies which underpins the federal Truth–in–Lending Act, 15 U.S.C. § 1601, *et seq.* (hereinafter "the TILA"), is that, by establishing statutory damage liability of creditors to consumers in private actions, the Act will provide economic incentives to creditors to desist from widespread TILA disclosure violations which might subject them to liability. *See In re Russell,* 72 B.R. 855, 862 (Bankr.E.D. Pa.1987). Therefore, one might expect that, after a particular creditor is targeted for liability as the result of a certain practice, it would discontinue that practice forthwith.

No single practice of a particular creditor has been the subject of more TILA litigation in the Eastern District of Pennsylvania than the persistent failure of MID–PENN CONSUMER DISCOUNT CO., the Defendant in this proceeding (hereinafter "Mid–Penn"), to disclose that, when it refinances prior loans secured by mortgages, it not only takes a new mortgage, but it also fails to satisfy the mortgages taken to secure prior loans, leaving it with a string of multiple mortgages. Nevertheless, Mid–Penn has refused to alter its practices since the initial decision in this line of cases, *Bookhart v. Mid–Penn Consumer Discount Co.,* 559 F.Supp. 208, 211–12 (E.D.Pa.), on January 31, 1983.

On March 3, 1989, after over six years of numerous successful lawsuits against Mid–Penn on the basis of this issue subsequent to *Bookhart,* the Federal Reserve Board, in accordance with its legislative rulemaking powers, promulgated an Official Staff Commentary, at ¶ 226.23(b)3, which eliminated the failure to disclose retention of multiple mortgages in the notice of the right to rescind the transaction given to consumers as a basis to rescind that credit transaction.[1] The issue raised by

---

1. This Commentary would not apparently affect the established law that the failure of Mid–Penn
to disclose multiple mortgages is an inaccurate disclosure of the security interests taken which

Mid–Penn in the instant proceeding is whether this Commentary should be applied to transactions which occurred prior to March 3, 1989, *i.e.*, retroactively. We conclude that legislative rulemaking should not be applied retroactively unless the party supporting such an application proves that the agency that promulgated the rulemaking expressly indicated an intention to apply it retroactively and the public interest and the equities between the parties are advanced thereby. Since both of these elements are absent here, we decline to apply the Commentary retroactively. *Accord, Nichols v. Mid–Penn Consumer Discount Co.*, C.A. No. 88–1253, slip op. at 11–12 n. 2, 1989 WL 46682 (E.D.Pa. April 28, 1989) hereinafter cited as (*"Nichols II"*). Therefore, this decision is one more in the consistent line of cases which declines to excuse Mid–Penn for liability for the failure to correct practices which have been consistently declared illegal since the *Bookhart* decision.

## B. PROCEDURAL AND FACTUAL HISTORY

The Debtor, ALGERIA PERKINS, filed the Chapter 13 bankruptcy case underlying this proceeding on November 7, 1988. The case has proceeded deliberately, initially due to the Debtor's slow payment of the filing fees only after a motion to dismiss the case was filed.

On May 2, 1989, Mid–Penn filed a motion seeking relief from the automatic stay due to the Debtor's failure to timely make post-petition payments to it, even under a negotiated revised payment schedule which decreased her monthly payments from $170 to $110. On June 16, 1989, after a contested hearing which ended in basic agreement by the parties, we denied this motion on the conditions that the Debtor faithfully pay the $110 monthly payments to Mid–Penn and maintain her payments to the Trustee in the future pending confirmation. The

confirmation hearing, the normal course of the scheduling of which was disrupted by the dismissal motion, was scheduled on July 20, 1989.

This period of relative harmony between the parties was brief. On July 11, 1989, the Debtor shattered the truce by commencing the instant adversary proceeding against Mid–Penn. The matter was originally listed for trial on August 24, 1989, and we continued the confirmation hearing until that date. On August 24, 1989, a mutual request for a continuance until September 21, 1989, was met with the court's directive that this proceeding must be tried on that date if not amicably resolved. The confirmation hearing was continued to that date also.

On September 21, 1989, the parties appeared and indicated a desire, memorialized by our Order of that date, to present this matter on a Stipulation of Facts to be filed by September 28, 1989, and Briefs to be filed by October 12, 1989 (Debtor), and October 26, 1989 (Mid–Penn). The confirmation hearing was continued until November 14, 1989.

A very skimpy (five-paragraph) Stipulation of Facts, incorporating but five exhibits, was filed on September 28, 1989. Presumably, the parties did not wish to reiterate the richer factual admissions in Mid–Penn's Answer to the Debtor's Amended Complaint. The Debtor filed her Brief one day late, on October 13, 1989, and Mid–Penn, asserting a last-minute calendaring error, was permitted an extension until November 2, 1989, to file its Brief, and it did so on November 3, 1989.

The pleadings and Stipulation indicate that Mid–Penn had the inevitable series of loan transactions with the Debtor, including an unbroken string of refinancings. *See Abele, supra,* 77 B.R. at 461 (debtors had eight transactions); and *In re Tucker,* 74 B.R. 923, 926–27 (Bankr.E.D.Pa.1987)

---

are set forth in the disclosure statement itself. *See* 15 U.S.C. §§ 1638(a)(9), 1640(a)(3). Rather, the Commentary appears to be a refinement of the elimination of the erroneous disclosure of the security interests taken in a transaction from the list of "material disclosures" of the

TILA which would justify a rescission. *See* 15 U.S.C. § 1602(u); *Abele v. Mid–Penn Consumer Discount Co.*, 77 B.R. 460, 462–63 & n. 1, 465–67 (E.D.Pa.1987), *aff'd,* 845 F.2d 1009 (3d Cir.1988); and page 869 *infra.*

(financial advantages to Mid–Penn in such refinancings is analyzed). Here, we are advised of loans by the Debtor from Mid–Penn, secured by mortgages, on the following dates: (1) December 21, 1984; (2) May 13, 1985; (3) December 3, 1985; and (4) November 10, 1986. After the fourth transaction, Mid–Penn satisfied the mortgage taken in connection with the third transaction on December 9, 1986. However, it did nothing to release or satisfy the mortgages taken in the first and second transactions until it mailed executed satisfaction pieces for these mortgages to the Debtor on November 12, 1987.

Among the documents delivered to the Debtor in the course of the fourth transaction was a Notice of Right to Cancel form which appears to be a facsimile of the Rescission Model Form (General), appearing as Appendix H–8 to Regulation Z, 12 C.F.R. § 226.1 et seq. (hereinafter "Reg. Z"). The first paragraph of the Notice, accordingly, reads as follows:

Your Right to Cancel:

You are entering into a transaction that will result in a (mortgage/lien/security interest) (on/in) your home. You have a legal right under federal law to cancel this transaction, without cost, within three business days from whichever of the following events occurs last:

. . .

The transaction of November 10, 1986, contemplated an "Amount Financed" of $4,959.20; a Finance Charge of $3,200.80, arising due to the Debtor's making payments over 48 months at an annual percentage rate of 27 percent; and payments of $170 monthly, resulting in a Total of Payments of $8,160.00. As of the date of the parties' Stipulation, it was agreed that the Debtor had repaid a total of $3,270.[2]

On May 17, 1989, the Debtor, by her counsel's letter, purported to rescind the November 10, 1986, transaction, on the ground that Mid–Penn had violated Reg. Z,

12 C.F.R. §§ 226.23(b)(1) and (b)(4), by failing to disclose all of the security interests which it had retained and the effects of a potential rescission, presumably due, in both instances, to the failure of Mid–Penn to disclose the existence of the multiple mortgages which it had held against the Debtor. See Nichols II, supra, slip op. at 9–11; Gill v. Mid–Penn Consumer Discount Co., 671 F.Supp. 1021, 1024–25 (E.D. Pa.1987), aff'd, 853 F.2d 917 (3d Cir.1988); In re Melvin, 75 B.R. 952, 956–57 (Bankr. E.D.Pa.1987); and Tucker, supra, 74 B.R. at 930–31. True to form, however, Mid–Penn directed a letter of May 24, 1989, to the Debtor's counsel refusing to accept the notice of the rescission.

The instant litigation followed.

C. THE HISTORY OF THE VIOLATION OF TILA AND REG. Z EFFECTED BY THE FAILURE TO DISCLOSE RETENTION OF MULTIPLE MORTGAGES: MID–PENN VS. THE COURTS.

In Bookhart, supra, the district court, per the Honorable Louis C. Bechtle, held that Mid–Penn's failure to recite on its TILA disclosure statement that it retained a mortgage taken in a prior loan as of the date of a refinancing of that previous loan on January 23, 1979, as well as a mortgage taken in connection with the current loan, violated 15 U.S.C. § 1638(d)(8) of the original version of the TILA.[3]

The next important decision in this line of cases was the entry of summary judgment against Mid–Penn by our predecessor, the Honorable William A. King, Jr., in Abele on May 22, 1986. In this decision, unaccompanied by an Opinion, Judge King allowed the Debtors to rescind all eight transactions in their series of refinancings of loans from Mid–Penn on, apparently, the same grounds as Bookhart, i.e., that Mid–Penn's failure to disclose the retention of multiple mortgages in its TILA disclosure

2. Between the date of the Stipulation on September 28, 1989, and the date of this Opinion at least one monthly payment of $110 was due and presumably paid. Thus, the payment total should now be at least $3,380.

3. This provision required a description of any security interest held or retained in the transaction. The present recodification of this Act section is 15 U.S.C. § 1638(a)(9).

statements was a material disclosure violation of the TILA, similar to the reasoning in *Bookhart*.

On appeal, Chief Judge Emeritus Joseph S. Lord, III, in a detailed Opinion of August 19, 1987, mostly affirmed Judge King's result in *Abele, supra*. Judge Lord noted that, effective October 1, 1982, Congress had amended and "simplified" the TILA. *See, e.g., In re Brown, Brown v. Credithrift of America Consumer Discount Co.*, 106 B.R. 852, 853 (Bankr.E.D. Pa.1989); and *In re Ashhurst*, 80 B.R. 49, 49 n. 1 (Bankr.E.D.Pa.1987). Among the amendments effected · in the "simplification" process were the addition of 15 U.S.C. § 1602(u) and 12 C.F.R. § 226.23(a)(3) n. 48, which, for the first time in the history of the TILA, undertook to define those "material disclosures" the failure of the creditor of which to accurately provide would permit the consumer to rescind. *Abele, supra*, 77 B.R. at 465. Conspicuously absent from this list of "material disclosures" was the failure to accurately disclose the security interests taken in the transaction. *Id.*

All but the last of the *Abele* transactions in issue had, however, pre-dated October 1, 1982. *Id.* at 461, 462. The debtors' attorney had conceded that he could not rescind the last transaction due to the changes in the law, effective October 1, 1982, and the complaint was accordingly amended to withdraw any claim of rescission as to this last transaction. *Id.* at 462. Judge King nevertheless had permitted rescission of *all* of the last five loans. *Id.* at 462–63. While Chief Judge Lord corrected the error in allowing rescission of the last transaction under the legal theory pleaded, *id.* at 468–69, he nevertheless affirmed the rescission of the transactions which pre-dated October 1, 1982. *Id.* at 463–68. In so doing, he observed that Mid–Penn had not argued that *Bookhart* had been incorrect in concluding that a failure to accurately disclose that security interests taken prior

to October 1, 1982, was a "material disclosure" violation of the TILA. *Id.* at 465 n. 3. Also, he rejected Mid–Penn's efforts to argue that the post–October 1, 1982 version of the TILA should be retroactively applied to transactions pre-dating the effective date of the new law. *Id.* at 465–67.[4]

On April 21, 1988, the Third Circuit Court of Appeals affirmed Judge Lord's disposition in *Abele* without opinion.

Decided just prior to the district court decision in *Abele* were this court's opinions in *Melvin, supra*,[5] and *Tucker, supra*, on June 18, 1987, and July 22, 1987, respectively. In these cases, the debtors, having successfully adapted to the new version of the TILA, did not rely upon the creditors' erroneous disclosures of security interests in the respective disclosure statements given to the consumers in these respective transactions as the bases for rescissions. Rather, they relied upon deficiencies in the respective Notices of Rescission themselves, instead of the TILA disclosure statements, which remained sufficient, under the new version of TILA, to permit a rescission. *See* 15 U.S.C. 1635(b); 12 C.F.R. §§ 226.23(a)(3), (b); *Melvin*, 75 B.R. at 956; and *Tucker*, 74 B.R. at 930.

In ruling in favor of the consumer-debtors in *Melvin* and *Tucker*, we relied in part upon the failure of the respective creditors' notices of rescission to accurately reflect that they were retaining more than one mortgage in the transactions of which rescissions were sought, and that rescission of *both* of the transactions from which mortgages were retained would be necessary to eliminate all of the security interests taken against the debtors' respective residences. *Melvin*, 75 B.R. at 956–57; and *Tucker*, 74 B.R. at 931. However, we also noted that the respective creditors had violated 12 C.F.R. §§ 226.23(b)(1) and (b)(4) by utilizing the entirely wrong rescission notice form.

---

**4.** Since the decision in *Bookhart* was rendered after the effective date of the amendments to TILA, it can be perceived that the court, in that case as well, implicitly refused to apply the new version of TILA retroactively.

**5.** *Melvin* is one of the few cases in this line which did not involve Mid–Penn. The defendant in that proceeding was Beneficial Consumer Discount Co.

In this vein, we noted that, in an unreported Order in *In re Matzulis, Matzulis v. Mid–Penn Consumer Discount Co.,* Bankr. No. 86–01964G, Adv. No. 86–0691 (Bankr.E.D.Pa. January 22, 1987), we had held that, when a creditor refinances a loan in its entirety rather than merely increasing the credit advanced on an outstanding loan and takes a new mortgage instead of merely retaining the previous mortgage to sustain the new advance, the creditor properly used a rescission notice similar in content to Appendix H–8.[6] In *Melvin,* the creditor had used a facsimile of the rescission notice contained in Model Form (Refinancing), Appendix H–9 to Reg. Z. 75 B.R. at 956–57. In the factual matrix underling the decision in *Tucker,* Mid–Penn inexplicably utilized what we termed an unacceptable hybrid between Appendices H–8 and H–9, rather than the H–8 facsimile the use of which we had approved in *Matzulis.* 74 B.R. at 931.[7]

The next group of cases includes the decision of October 22, 1987, by District Judge Charles R. Weiner, summarily affirmed by the Third Circuit, in *Gill, supra;* our very similar decisions of October 23, 1987, in *In re Jones,* 79 B.R. 233 (Bankr.E. D.Pa.1987), *rev'd in part on other grounds sub nom. Jones v. Mid–Penn Consumer Discount Co.,* 93 B.R. 66 (E.D. Pa.1988);[8] and of November 10, 1987, in *In re Nichols, Nichols v. Mid–Penn Consumer Discount Co.,* Bankr. No. 86–05809S, Adv. No. 87–0600S (Bankr.E.D.Pa. Nov. 10, 1987) (hereinafter *"Nichols I"*), *aff'd, Nichols II, supra;*[9] and *In re Growells, Growells v. Mid–Penn Consumer Dis-*

*count Co.,* Bankr. No. 87–02714F, Adv. No. 87–0592F (Bankr.E.D.Pa. July 26, 1988), an unpublished decision by our colleague, Bankruptcy Judge Bruce Fox. In *Growells, supra,* slip op. at 8, 10; *Nichols* (see *Nichols II,* slip op. at 2); and *Jones, supra,* 79 B.R. at 235, 239–41,[10] Mid–Penn utilized the Appendix H–8 form in the transaction which the court ultimately rescinded which, in accordance with our decision in *Matzulis,* was the correct rescission notice form to use in these circumstances. However, in each case, the respective courts allowed rescission because the notice failed to disclose that Mid–Penn was retaining multiple mortgages.

On December 5, 1988, the Board of Governors of the Federal Reserve System published a series of "proposed official staff interpretations" in the Federal Register, which would, if approved, be added to its publication of Official Staff Commentary on Regulation Z Truth in Lending (hereinafter "the Commentary"). 53 Fed.Reg. 48,925. This publication was in accordance with the Administrative Procedure Act (hereinafter "APA"), 5 U.S.C. § 553(b). Included among the interpretational changes and additional was the following, 53 Fed. Reg. at 48,929:

Section 226.23—Right of Rescission

\* \* \* \* \* \*

23(b) Notice of Right to Rescind

\* \* \* \* \* \*

3. Content. \* \* \* In disclosing the retention or acquisition of a security interest, a creditor need not separately dis-

---

**6.** This was the sole issue raised in *Matzulis* and hence Mid–Penn was successful in that proceeding.

**7.** The March 3, 1989, Commentary would obviously not permit a creditor to utilize the incorrect model form. We continue to believe that the H–9 form is appropriately used only in what appears to be the relatively rare situation where the mortgage taken in the original loan transaction is retained as security and the new transaction hence involves only a supplement to the original loan. *Compare Melvin,* 75 B.R. at 957 (the creditor had structured one of the loans, the 1978 transaction, in this manner). We also note the use of the H–8 form in the crucial November 10, 1986, transaction with the Debtor here. Contrary to the Debtor's claims that Mid-

Penn should have used the H–9 form, we continue to believe that *Matzulis* was correctly decided and we reject that claim.

**8.** The "other grounds" were that we were found not to have been sufficiently generous in measuring the attorneys' fees due to the debtor from Mid–Penn.

**9.** We did not publish the Memorandum which explained our *Nichols* decision because the issues presented were the mirror image of those in *Jones, supra,* which we had published.

**10.** It is impossible to ascertain what form was used from the recitation of the facts in *Gill, supra.*

close multiple security interests that it may hold in the property. The creditor need only disclose that the transaction is secured by the consumer's principal dwelling, even when security interests from prior transactions remain of record and a new security interest is taken in connection with the transaction.

\*    \*    \*    \*    \*    \*

The explanation of this proposal, included at 53 Fed.Reg. at 48,926–27, was as follows:

> Section 226.23—Right of Rescission
>
> 23(b). Notice of Right to Rescind
>
> Comment 23(b)–3 would be revised to clarify the requirements for the disclosure of security interests on rescission notices. Recently, there has been some dispute over the specificity required in such a disclosure. The revised comment would make clear that where security interests taken in connection with prior transactions remain of record and a new security interest is taken, the rescission notice need not detail each interest that the creditor may hold in the property. Rather, a simple disclosure of the fact that the transaction is secured by the consumer's principal dwelling is sufficient.

This proposed addition to the Commentary in fact became effective on March 3, 1989. Thus, if this addition to the Commentary were valid, Mid–Penn, at least as to transactions in which it entered into subsequent to March 3, 1989, and in which it used the proper rescission notice form, was relieved of exposure to rescission (if not liability for a violation of 15 U.S.C. § 1638(a)(9)),[11] despite the rulings of three judges of this court, three district judges, and two panels of the Court of Appeals to the contrary.[12]

The principal issue presented in this proceeding is whether the new Commentary applies as to transactions prior to March 3, 1989.[13] This is not an issue of first impression. The *Nichols II* matter was on appeal as of March 3, 1989, when the amendment to the Commentary was promulgated. In dismissing Mid–Penn's contention that the amendment to the Commentary should be applied retroactively, Judge Bechtle, deciding *Nichols II* consistently with his earlier Opinion in *Bookhart*,[14] stated, slip op. at 12 n. 2, as follows:

> Mid–Penn presently argues that this new commentary, along with the other points raised in its previous briefs, shows that the bankruptcy court erred on the

---

**11.** *See* pages 864–65 n. 1 *supra.*

**12.** The only decision arguably in this line of cases decided in favor of Mid–Penn was our decision in *Matzulis.* However, in that case, the debtor focused solely upon the alleged use of the wrong rescission form, and did not reference any undisclosed retention of multiple security interests in that transaction.

**13.** The Debtor raises several other issues, including the following of which we make the following respective dispositions: (1) The Commentary applies only to transactions in which the Appendix H–9 rescission notice form is utilized. We see no reason to so limit the intended scope of the Commentary. It does address mortgages from "prior transactions." However, as our decision in *Matzulis, Melvin,* and *Tucker* make clear, the Appendix H–8 form may be appropriate to use even when there has been a "prior transaction;" (2) The use of the Appendix H–8 form was improper. We disagree on the basis of our holdings in *Matzulis, Melvin,* and *Tucker;* (3) The Commentary should not be followed because it is "demonstrably irrational," citing *Securities Industry Ass'n v. Board of Governors of Federal Reserve System,* 468 U.S. 137, 142–44, 104 S.Ct. 2979, 2982–83, 82 L.Ed.2d 107

(1984). *See also, e.g., Director, Office of Workers' Compensation Programs v. Gardner,* 882 F.2d 67, 70–72 (3d Cir.1989). The difficulties with this contention, despite its logical appeal due to the inconsistency of the Commentary with unanimous decisions of the local courts, are as follows: (a) The regulation in issue here was promulgated pursuant to the Federal Reserve Board's legislature rulemaking powers, *see* page 871 n. 16 *infra* and the cases cited therein, which allow it to be accorded a greater degree of deference than the interpretative rules in issue in *Security Industry Ass'n, supra;* and *Gardner, supra;* and (b) The Supreme Court, in *Anderson Bros. Ford v. Valencia,* 452 U.S. 205, 219, 101 S.Ct. 2266, 2273, 68 L.Ed.2d 783 (1982); and *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 566–70, 100 S.Ct. 790, 797–99, 63 L.Ed.2d 22 (1980), appears to suggest that the Federal Reserve Board is accorded particular deference in the area of interpretation of the "highly technical" TILA.

**14.** *See* page 867 n. 4 *supra,* in which we point out that *Bookhart,* in which the court held that the failure to properly disclose the security interest taken by Mid–Penn was a "material violation" of the TILA, was decided after the effective

disclosure issue. The Court does not think that this change in the agency's commentary rectifies the aforementioned problem with Mid–Penn's arguments on this issue. Mid–Penn was obligated to satisfy the disclosure requirements outlined in Reg. Z as it existed at the time of the November, 1983 loan transaction. A subsequent change in the agency's official commentary concerning regulations it has promulgated does not exonerate Mid–Penn's actions in this regard.[15]

We note that Mid–Penn, in its Brief, fails to cite or attempt to distinguish *Nichols II*. Nor does it cite any of the decisions cited at pages 866–68 *supra* except the unreported Order of this court in its favor in *Matzulis*. This apparent blindness to the strengths of arguments against it is reflected by Mid–Penn's intractability in refusing to disclose that it retains multiple mortgages, despite over six years of consistent decisions holding that its failure to do so violates the TILA. As *Nichols II* emphasizes, it is only the failure to *disclose* these multiple mortgages, not the mere taking of same, which triggers consequences under the TILA. *Nichols II*, slip op. at 9–10. The same sort of blindness to the true underlying issue pervades Mid–Penn's argument in its Brief that the Commentary should be applied retroactively.

D. SINCE THE PROMULGATION OF THE AMENDMENT TO THE COMMENTARY WAS "LEGISLATIVE RULEMAKING," AND THERE IS NO EXPRESSION FROM THE AGENCY PROMULGATING THE AMENDMENT THAT IT SHOULD BE APPLIED RETROACTIVELY, NOR ANY STRONG PUBLIC INTEREST SERVED BY SUCH AN INTERPRETATION, THE COMMENTARY SHOULD NOT BE APPLIED RETROACTIVELY.

▮ Mid–Penn's argument relating to retroactivity is articulated in the following paragraph of its Memorandum of Law Against Debtor's Complaint, at 7:

Clearly this revision to the Official Staff Commentary is an Interpretative Rule under the Administrative Procedures Act 5 U.S.C. Section 551, et seq. An interpretative Rule, as distinguished from a substantive or legislative Rule clarifies or explains existing law or regulation. See *McKenzie v. [Bowen]*, 787 F.2d 1216, 1222 (8th Cir.1986). Section 553(d) of the Act differentiates between substantive rules and interpretive rules by removing the requirement of publishing the proposed rule at least thirty (30) days before its effective date.

The major flaw in this argument is that the revision to the Commentary of March 3, 1989, was not an "interpretive rule." As the APA itself indicates, the requirement of publication in the Federal Register does not apply as to an "interpretive rule." 5 U.S.C. § 553(d)(2). In fact, the sole issue in *McKenzie, supra*, 787 F.2d at 1222–23, as in the only other authority cited by Mid–Penn on this point, *Energy Reserves Group, Inc. v. Department of Energy*, 589 F.2d 1082, 1099–1100 (Temp.Emer.Ct.App. 1978), was whether the regulation in issue was an "interpretive rule" such that publication in the Federal Register need not have preceded its promulgation.

The amendment to the Commentary in question was, however, promulgated only *after* full compliance with the publication requirements of 5 U.S.C. § 553(b). *See* 53 Fed.Reg. 48,925 (Dec. 5, 1985); and pages 868–69 *supra*. Therefore, it appears clear that, in the view of the agency promulgating it, the amendments to the Commentary were *not* mere interpretive rules within the scope of 5 U.S.C. § 553(d)(2).

It is well established that the two principle distinctions between "interpretive rules" and "legislative rules" are whether

---

date of the amendment to the TILA expressly stating, for the first time, that such a violation was *not* a "material violation" of the TILA. The transaction in *Bookhart,* of course, predated October 1, 1982.

**15.** We note that Mid–Penn has appealed the *Nichols* decision to the Third Circuit Court of Appeals, at No. 89–1445, before which it is scheduled for oral argument on November 17, 1989.

(1) the procedures of 5 U.S.C. § 553(b) are deemed to apply; and (2) the rule has the "force of law." *See, e.g., American Trucking Ass'n, Inc. v. United States*, 688 F.2d 1337, 1341–42 (11th Cir.1982); and *Production Tool Corp. v. Employment & Training Adm'n*, 688 F.2d 1161, 1165–66 (7th Cir.1982). *Accord, Huberman v. Perales*, 884 F.2d 62, 68 (2d Cir.1989); and *National Latino Media Coalition v. Federal Communications Comm'n*, 816 F.2d 785, 787–88 (D.C.Cir.1987). Since it adhered to them, the Federal Reserve Board obviously deemed the procedures of 5 U.S.C. § 553(b) to apply to the instant rulemaking. Further, if this Commentary is to have the effect of overruling the unanimous decisions of two Circuit Court panels, three district court judges, and three bankruptcy judges in this district, the Commentary amendment would appear to have the force of substantive law. Therefore, we conclude, with little difficulty, that the promulgation of the Commentary revisions of March 3, 1989, was "legislative rulemaking" and not, as Mid–Penn contends, mere "interpretive rulemaking." [16]

Having reached this conclusion, we note that the analysis of the Debtor on this issue is somewhat flawed as well. She relies heavily on cases such as *Sam v. United States*, 682 F.2d 925, 930–32, 230 Ct.Cl. 596 (Ct.Cl.1982), which address the issue of retroactivity in the context of "adjudicative rulemaking," *i.e.*, rulemaking through the adjudicative decisionmaking process rather than through the processes of the APA. *See, e.g., Securities & Exchange Comm'n v. Chenery Corp.*, 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947); *Daughters of Miriam Center, supra*, 590 F.2d at 1259–60; *Lodges 743 & 1746, Int'l Machinists, etc. v. United Aircraft Corp.*, 534 F.2d 422, 452–53 (2d Cir. 1975); and *Retail, Wholesale and Dep't Store Union, etc. v. National Labor Relations Bd.*, 466 F.2d 380, 387–93 (D.C.Cir.

1972) (these cases each recite considerations to be addressed in determining retroactivity of "adjudicative rulemaking"). *But see* pages 872–73 n. 17 *infra* (factors for deciding whether to apply "adjudicative rulemaking" retroactively would not support retroactive application of the Commentary).

Having dispelled the misimpression of both parties as to the body of administrative law which we believe is at issue, *i.e.*, that body addressing the retroactivity of "legislative rulemaking," we find the applicable principles readily at hand. Defining the term "rule," as applied to "legislative rulemaking," the APA, at 5 U.S.C. § 551(4), states as follows:

§ 551. Definitions

For the purposes of this subchapter—

.    .    .    .    .

(4) "rule" means the whole or a part of an agency statement of general or particular applicability and *future effect* designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing; . . . (emphasis added).

There is a difference of opinion as to whether the language emphasized above, having defined legislative rules as having only "future effect," bars legislative rules from being applied retroactively. *Compare Bowen v. Georgetown University Hospital*, —— U.S. ——, 109 S.Ct. 468, 475–76, 102 L.Ed.2d 493 (1988) (Scalia, J., conc. op.); and *Georgetown University Hospital v. Bowen*, 821 F.2d 750, 757 (D.C.Cir.1987), *aff'd*, —— U.S. ——, 109 S.Ct. 468, 102

---

**16.** Were we to conclude that the promulgation of the Commentary amendments was mere "interpretive rulemaking," we might be disinclined to give the Commentary amendments a great degree of deference. *See, e.g., National Latino, supra*, 816 F.2d at 789–90; *Pennzoil Co. v. United*

*States Dep't of Energy*, 680 F.2d 156, 171–72 (Temp.Emer.Ct.App.1982); and *Daughters of Miriam Center for the Aged v. Mathews*, 590 F.2d 1250, 1258–59 (3d Cir.1978). *See* pages 869–70 n. 13 *supra*.

L.Ed.2d 493 (1988) (retroactive effect is foreclosed) *with Colyer v. Harris*, 519 F.Supp. 692, 697–99 (S.D.Ohio 1981) (retroactive effect is not foreclosed, but it is permissible only in those situations where legislation might be applied retroactively).

Without addressing this issue directly, except insofar as the Court failed to expressly adopt the "absolutist" position articulated in the opinion of Justice Scalia and the Circuit Court, the majority of the court, per Justice Kennedy, states, in *Georgetown*, 109 S.Ct. at 471, as follows:

Retroactivity is not favored in the law. Thus, Congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result. *E.g., Greene v. United States*, 376 U.S. 149, 160, 84 S.Ct. 615, 621–22, 11 L.Ed.2d 576 (1964); *Claridge Apartments Co., v. Commissioner*, 323 U.S. 141, 164, 65 S.Ct. 172, 185, 89 L.Ed. 139 (1944); *Miller v. United States*, 294 U.S. 435, 439, 55 S.Ct. 440, 441–42, 79 L.Ed. 977 (1935); *United States v. Magnolia Petroleum Co.*, 276 U.S. 160, 162–63, 48 S.Ct. 236, 237, 72 L.Ed. 509 (1928). By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless the power is conveyed by Congress in express terms. *See Brimstone R. Co. v. United States*, 276 U.S. 104, 122, 48 S.Ct. 282, 287, 72 L.Ed. 487 (1928) ("The power to require readjustments for the past is drastic. It

... ought not to be extended so as to permit unreasonably harsh action without very plain words"). Even where some substantial justification for retroactive rulemaking is presented, courts should be reluctant to find such authority absent an express statutory grant.

We are bound to follow the principles of law thus enunciated in *Georgetown* in deciding whether to apply the amendments to the Commentary in issue retroactively, contrary to Mid–Penn's contentions that the principles of *Georgetown* should not be applied here because the promulgation of the Commentary allegedly constituted only "interpretive rulemaking." We observe that the principles of *Georgetown* suggest that the general presumption against retroactivity applied to interpretation of legislation should be applied here. *See, e.g., United States v. Security Industrial Bank.*, 459 U.S. 70, 79, 103 S.Ct. 407, 412–13, 74 L.Ed.2d 235 (1982); and *In re Franklin Pembroke Venture II*, 105 B.R. 276, 279–80 (Bankr.E.D.Pa. Oct. 5, 1989).

Applying these principles to the question of whether the instant Commentary should be applied retroactively is rather simple. The language of the Commentary, even as explained in the Federal Register, 53 Fed. Reg. 48,926–27, *see* pages 868–69 *supra*, provides no indication that its terms should be applied retroactively. Also, there is no "substantial justification," such as the public interest found present in *Chenery Corp.*, to justify retroactive effect of "adjudicative rulemaking" here. 332 U.S. at 202–08, 67 S.Ct. at 1580–83.[17] The general

---

**17.** Even if we considered the "fair and equitable" standard set forth in *Chenery Corp.* or the five-pronged test set forth in *International Machinist, supra*, 534 F.2d at 453, and *Retail, Wholesale, supra*, 466 F.2d at 390, to determine whether the rulemaking here, assuming *arguendo* it were "adjudicative rulemaking," should be applied retroactively, retroactive application of the Commentary would not be justified. The five-prong test stated therein, *id.*, is as follows: "(1) whether the particular case is one of first impression, (2) whether the new rule represents an abrupt departure from well established practice or merely attempts to fill a void in an unsettled area of the law, (3) the extent to which the party against whom the rule is applied relied on the former rule, (4) the degree of the burden which a retroactive order imposes on a party,

and (5) the statutory interest in applying a new rule despite reliance of a party on the old standard." The instant amendment to the Commentary does not address a matter of first impression, but rather concerning an issue established for six years contrary to the portion of the Commentary amendment in the local caselaw. The departure from these prior authorities, though abrupt, *favors* Mid–Penn. Prior to the promulgation of the Commentary amendment, Mid–Penn had no basis on which to rely for exoneration for declining to disclose its taking of multiple mortgages in its rescission notice. Therefore, the Commentary lightens the burden on Mid–Penn. Given the previous standards, Mid–Penn had every reason to assume that its actions in failing to disclose its retention of

rule disfavoring retroactive application of the Commentary amendment must therefore be followed here.

We note, finally, that the result not to apply the amendment to the Commentary to transactions consummated prior to its enactment is consistent with other rulings in analogous situations, as well as the ruling on this precise point by Judge Bechtle in *Nichols II, supra,* slip op. at 11–12 n. 2. In *Security Industrial Bank, supra,* the court refused to apply 11 U.S.C. § 522(f)(2) to contracts executed prior to the enactment of the Code, stating that to do so might impact upon property rights otherwise settled prior to its enactment in violation of Art. I, § 8, cl. 4 of the Constitution, *i.e.,* the "Takings Clause." 459 U.S. at 79–80, 103 S.Ct. at 412–13.

In *Abele,* over the arguments to the contrary of Mid–Penn, Chief Judge Emeritus Lord applied the new restrictive definition of "material disclosures" of the TILA included in the amendments to TILA, prospectively only, *i.e.,* only as to contracts executed after the effective date of the TILA amendments. 77 B.R. at 465–67. Thus, Judge Lord left intact the implicit holding of *Bookhart* that the newly-enacted definition of "material disclosures" included in the TILA amendments would not be applied to contracts which pre-dated the amendments. We note that the prior version of TILA was silent on the issue of what constituted "material disclosures." Nevertheless, the judge-made rule in *Bookhart* that a failure to disclose the retention of multiple security interests was held not to be overturned by the subsequent statement of Congress itself, in the TILA amendments, which expressly excluded such disclosures from the scope of "material disclosures." [18]

The instant case presents, if anything, an easier question than Judge Lord faced in

*Abele.* The Commentary amendment is, we believe, a further refinement, by the Federal Reserve Board and not by Congress, on the scope of what disclosure violations are sufficiently material to constitute grounds for rescission, which was the same subject matter as was considered in *Abele.* Since the narrowing of the scope of "material disclosures" was not retroactively applied in *Abele,* in a result affirmed by the Court of Appeals, we reject Mid–Penn's similar contention that we should apply the instant Commentary Amendment retroactively.

In retrospect, Mid–Penn had no reason to conclude, at the time that this transaction occurred on November 10, 1986, that its failure to disclose to the Debtor, in the notice to her of her rescission rights, that it retained multiple mortgages against her residence would not constitute a basis for her to rescind. It had received, as of that date, two decisions in the long line of cases, *see* pages 866–68 *supra, i.e., Bookhart* and this court's *Abele* decision, which consistently ruled against it on this point. It nevertheless chose to take the chance that failing to disclose this element to the Debtor was worth the risk of liability for future TILA violations. Having taken the risk of being cited for this violation, and having now had this violation asserted against it, Mid–Penn should not be able to invoke, in its defense, a Commentary which was not even proposed until two years after the transaction. Allowing Mid–Penn impunity for its actions would allow it to unfairly escape its attempts to frustrate the TILA goal, articulated at page 864 *supra,* of inducing voluntary compliance with its provisions by economic incentives.

We will therefore not apply the amendment to ¶ 226.23(b)3 of the Commentary, promulgated on March 3, 1989, to the instant transaction.

multiple mortgages could result in material TILA violations, justifying rescission. Hence, there is no equitable basis to reward Mid–Penn for its past failure to adhere to a line of decisions against it by granting it the windfall of retroactive invalidation of the consistent holdings in these cases.

**18.** This analogy to the reasoning of *Abele* completely answers Mid–Penn's argument that the previous silence of the TILA and Reg. Z on the issue of the impact of taking multiple mortgages requires that we consider the rulemaking "interpretive" and apply it retroactively.

E. SINCE THE DEBTOR'S RESCISSION OF THE TRANSACTION OF NOVEMBER 10, 1986, WAS VALID, MID–PENN'S REFUSAL TO HONOR THE RESCISSION TRIGGERS AT LEAST THOSE REMEDIES DEMANDED BY THE DEBTOR, *I.E.*, A DECLARATION OF RESCISSION; INVALIDATION OF MID–PENN'S SECURITY IN THE DEBTOR'S RESIDENCE; REDUCTION OF MID–PENN'S CLAIM TO AN UNSECURED CLAIM FOR THE UNPAID PRINCIPAL BALANCE OF $1,579.20; $1,000.00 IN STATUTORY DAMAGES; AND REASONABLE ATTORNEYS' FEES TO THE DEBTOR'S COUNSEL.

■ Having overcome the only novel impediment in her path to the remedies due to her for effecting a valid rescission of the transaction of November 10, 1986, which Mid–Penn expressly declined to acknowledge, the Debtor is entitled to the full panoply of relief accorded to similarly-situated consumers in *Growells, supra,* Order, ¶ s 2–7; *Jones, supra,* 79 B.R. at 241; and *Tucker, supra,* 74 B.R. at 932–34.

Clearly, without the revised Commentary as a shield, Mid–Penn has no defenses. In its Brief, it attempts to attach significance to the fact that it satisfied the mortgage from the December 3, 1985, transaction "within 26 days" from the date of the November 10, 1986, transaction. We believe that the time-span was in fact 29 days (November 10, 1986, to December 9, 1986). However, even if the time-period were "only" 26 days, we are not prepared to say that any period of hesitation in satisfaction of the prior mortgage beyond the three-day rescission period is reasonable. *See Nichols I, supra,* slip op. at 4–5. However, assuming *arguendo* that we found the satisfaction of the December 3, 1985, mortgage sufficiently timely to discount Mid–Penn's retention of *that* mortgage as a TILA violation, there is no dispute that the mortgages from the December 21, 1984, and May 13, 1985, transactions remained of record for more than a year after the November 10, 1986, transaction, as Mid–Penn did not send the satisfaction pieces for these mortgages to the Debtor until November 12, 1987.

Therefore, under the authority of all of the cases cited at pages 867–868 *supra,* from *Tucker* and thereafter, Mid–Penn has violated Reg. Z., 12 C.F.R. §§ 226.23(b)(1) and (b)(4), by failing to disclose its retention of at least two of the mortgages taken against the Debtor's residence in the transaction of November 10, 1986.

In *Brown, supra,* at 861–62, we recently revisited the consequences of an effective rescission under the TILA which the creditor refuses to acknowledge or properly act upon within the requisite 20–day period allotted for doing so, pursuant to 15 U.S.C. § 1635(b), 12 C.F.R. § 226.23(d)(2). There, we noted that the consequences are multifaceted. *Id.* at 861. Firstly, any remaining security interests taken by Mid–Penn against the Debtor's residence must be terminated. 15 U.S.C. § 1635(b), 12 C.F.R. § 226.23(d)(1). *See Brown, supra,* at 861; *In re Celona,* 90 B.R. 104, 115 (Bankr.E.D.Pa.1988), *aff'd sub nom. Celona v. Equitable National Bank,* 98 B.R. 705 (E.D.Pa.1989); *In re Gurst,* 79 B.R. 969, 978 (Bankr.E.D.Pa.1987), *appeal dismissed,* C.A. No. 88–2092 (E.D.Pa. Aug. 8, 1988), *aff'd,* 866 F.2d 1410 (3d Cir.1988); and 88 B.R. 57 (E.D.Pa.1988); *Melvin, supra,* 75 B.R. at 958; and *Tucker, supra,* 74 B.R. at 923. The secured claim of Mid–Penn is thus eliminated, and it is reduced to the status of an unsecured creditor.

Secondly, the Debtor is relieved of any liability to pay any finance charges imposed in the transaction. *See Brown, supra,* at 862; *Celona, supra,* 90 B.R. at 115, *Melvin, supra,* 75 B.R. at 958; and *Tucker, supra,* 74 B.R. at 932. Thus, all of the Debtor's payments, totalling at least $3,380, *see* page 866 n. 2 *supra,* may be deducted from the amount financed of $4,959.20, resulting in Mid–Penn's being left with an unsecured claim of but $1,579.20.

The only other remedy requested by the Debtor was a statutory penalty of $1,000 arising from Mid–Penn's violation of the

TILA in failing to respond to her valid rescission of the loan transaction in appropriate fashion and reasonable attorneys' fees and costs for her counsel. Clearly, these elements of damages are allowable. *See Brown, supra,* at 862; *Celona, supra,* 90 B.R. at 115–16; *Gurst, supra,* 79 B.R. at 979, 980; *Melvin, supra,* 75 B.R. at 958, 960; and *Tucker, supra,* 74 B.R. at 932–33.

Other remedies potentially recoverable by the Debtor were not requested and therefore must be deemed waived. *See Brown, supra,* at 862; *Celona, supra,* 90 B.R. at 115; and *Tucker, supra,* 74 B.R. at 933. The most apparent of these would have been a claim of recoupment of $1,000 against Mid–Penn's remaining unsecured claim in light of the disclosure violations on the TILA disclosure statement issued in connection with the November 10, 1986, transaction. *See Celona, supra,* 90 B.R. at 115; *Melvin, supra,* 75 B.R. at 959; and *Tucker, supra,* 74 B.R. at 932. Less obvious, but probably equally viable, would have been a claim that the entire loan balance be stricken. *See Gill, supra,* 671 F.Supp. at 1026; *Gurst, supra,* 79 B.R. at 979; and *Tucker, supra,* 74 B.R. at 933. An argument could even have been made that the payments remitted to Mid–Penn by the Debtor should be returned to her. *See Gurst, supra,* 79 B.R. at 979; and *Tucker, supra,* 74 B.R. at 933. However, the significant document for ascertaining the relief sought by the Debtor, *i.e.,* her Amended Complaint, claims only the elements of damages recited in the prior three paragraphs and "treble damages under 73 P.S. § 201–9.2," the Pennsylvania statute regulating *unfair* and *deceptive* acts and practices (hereinafter "UDAP"). These claims were totally undeveloped in the record and are not addressed in the Debtor's Brief. We therefore can award no damages to the Debtor based upon UDAP.

## F. CONCLUSION

An Order consistent with the conclusions expressed in this Opinion will be entered. Our Order also emphasizes our intention to make the Confirmation hearing continued until November 14, 1987, the last.

### ORDER

AND NOW, this 9th day of November, 1989, upon consideration of the Debtor's Amended Complaint and Answer thereto and the Stipulation of Facts and exhibits thereto which constitute the record in this proceeding, and the parties' respective Briefs, it is hereby ORDERED AND DECREED that:

1. Judgment is entered in favor of the Plaintiff–Debtor, ALGERIA PERKINS (hereinafter "the Debtor"), and against the Defendant, MID–PENN CONSUMER DISCOUNT COMPANY, (hereinafter referred to as "Mid–Penn").

2. It is DECLARED that the Debtor properly exercised her right to rescind the transaction between the parties of November 10, 1986, in issue and that therefore this contract is deemed RESCINDED.

3. The Claim of Mid–Penn against the Debtor is reduced to an unsecured claim in the amount of $1,579.20.

4. Mid–Penn is directed to satisfy the mortgage which it has taken against the Debtor's residential real estate at 1937 Plymouth Street, Philadelphia, Pennsylvania 19138, within fifteen (15) days from the date of this Order.

5. Mid–Penn shall pay the sum of $1,000.00 to the Standing Chapter 13 Trustee, Edward Sparkman, Esquire, as damages pursuant to 15 U.S.C. § 1640(a)(2)(A)(i). The said Trustee shall determine whether this sum may be claimed as part of the Debtor's exemptions, and, if it may be, he shall forward this sum to the Debtor forthwith.

6. The parties are urged to attempt to agree upon reasonable attorneys' fees and costs which are due to the Debtor's counsel, per 15 U.S.C. § 1640(a)(3). If this matter is not resolved within fifteen (15) days, the Debtor's counsel may, within thirty (30) days of this Order, file a Motion requesting such fees, said Motion to be procedurally in conformity with *Meade Land and Development Co., Inc.,* 527 F.2d 280 (3d Cir.1975); and *In re Mayflower Associates,* 78 B.R.

41 (Bankr.E.D.Pa.1987). However, if the Debtor's counsel has made a reasonable request for such fees which is refused, the said counsel may recover compensation for time spent on the fee application as well.

7. The hearing on Confirmation of the Debtor's Chapter 13 Plan of Reorganization in her main bankruptcy case remains scheduled on

TUESDAY, NOVEMBER 14, 1989, at 10:00 A.M. in Courtroom No. 2 (Room 3718), United States Court House, 601 Market Street, Philadelphia, PA 19106.

8. No further continuances of this hearing will be favored.